Janie H. Chang (SBN 235648)
jchang@gbla.org
Celida Miramontes (SBN 269783)
cmiramontes@gbla.org
GREATER BAKERSFIELD LEGAL ASSISTANCE, INC.
615 California Avenue
Bakersfield, CA 93304
Tel:    (661) 321-3994
Fax:    (661) 325-4482

Richard A. Rothschild (SBN 67356)
rrothschild@wclp.org
Stephanie E. Haffner (SBN 194192)
shaffner@wclp.org
Navneet K. Grewal (SBN 251930)
ngrewal@wclp.org
Madeline Howard (SBN 254660)
mhoward@wclp.org
WESTERN CENTER ON LAW AND POVERTY
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA  90010
Tel:  (213) 487-7211
Fax: (213) 487-0242

Attorneys for Plaintiffs

(Counsel for Plaintiffs continued on next page)

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTNEY MURPHY, JANE DOE, PATRICIA AZEVEDO, ANDREA GONZALES and MONICA DAVIS, <br><br> Plaintiffs, <br><br> vs. <br><br> HOUSING AUTHORITY OF THE COUNTY OF KERN and STEPHEN PELZ, in his official capacity as Executive Director of the Housing Authority of the County of Kern, and Does 1 through 10, <br><br> Defendants. | Case No. 1:14-CV-00776-JLT <br><br> **ORDER GRANTING STIPULATION AND [PROPOSED] ORDER APPROVING SETTLEMENT AGREEMENT AND DISMISSING CASE; EXHIBIT 1** <br><br> (Doc. 55) |

1  Amy P. Lally (SBN 198555)
   alally@sidley.com
2  Amanda V. Lopez (SBN 273602)
   alopez@sidley.com
3  Wesley R. Montalvo (280570)
   wmontalvo@sidley.com
4  William M. Rosenthal (SBN 287643)
   wrosenthal@sidley.com
5  SIDLEY AUSTIN LLP
   555 W. Fifth Street, Suite 4000
6  Los Angeles, CA 90013
   Tel: (213) 896-6677
7  Fax: (213) 896-6600

8  (Counsel for Plaintiffs continued from first page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER APPROVING SETTLEMENT AND DISMISSING CASE

1

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2

3

WHEREAS, Plaintiffs Brittney Murphy, Jane Doe, Patricia Azevedo, Andrea Gonzales, and

4

Monica Davis ("Plaintiffs"), and Defendants Housing Authority of the County Of Kern and Stephen

5

Pelz, in his official capacity as Executive Director of the Housing Authority of the County of Kern

6

("Defendants"), have entered into a Settlement Agreement, attached hereto as Exhibit 1, the terms of

which are hereby approved and incorporated into this Order;

7

IT IS HEREBY STIPULATED by and between the parties, through their designated counsel,

8

that all of the claims and counterclaims, if any, among and between Plaintiffs and Defendants, and

9

subject to the terms and conditions of the Settlement Agreement among the aforementioned parties,

10

be and hereby are dismissed with prejudice pursuant to Rule 41 of the Federal Rules of Civil

Procedure.

11

IT IS FURTHER STIPULATED that, without affecting the finality of this Order of

12

Dismissal with Prejudice in any way, this Court hereby orders the parties to comply with the

13

Settlement Agreement and retains continuing jurisdiction over all parties for the purpose of

14

enforcing the Settlement Agreement and its terms, and resolving any and all disputes arising under

15

or relating to said Settlement Agreement.  Any dispute or claim that relates to the Settlement

16

Agreement shall be resolved by the Honorable Jennifer L. Thurston or the judge or magistrate acting

in her stead.

17

IT IS FURTHER STIPULATED THAT the attached Settlement Agreement is not a finding

18

on the merits and shall not be construed as an admission of any violation of state or federal law.

19

20

**GREATER BAKERSFIELD LEGAL
ASSISTANCE INC.**

21

Dated:  March__, 2015

By: _____

22

Janie Chang
Attorneys for Plaintiffs

23

24

**WALL, WALL & PEAKE**

25

Dated:  February___, 2015

By: _____

26

Alan J. Peake
Attorneys for Defendants

27

28

1

1

2

3       The Court, having considered the parties' Settlement Agreement and Stipulation for

4  Dismissal hereby orders that:

5          1.   The parties comply with the terms of the Settlement Agreement.

6          2.   This matter is DISMISSED WITH PREJUDICE with this Court retaining jurisdiction to

              enforce the terms of the parties' Settlement Agreement.

7

8  IT IS SO ORDERED.

9

      Dated:   __**March 18, 2015**__          _____**/s/ Jennifer L. Thurston**

10                                              UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND ORDER FOR DISMISSAL PURSUANT TO SETTLEMENT AGREEMENT

# EXHIBIT 1

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is effective as of February ⎮⎮ , 2015 (the "Effective Date") and is entered into by and between Plaintiffs Brittney Murphy, Jane Doe, Patricia Azevedo, Andrea Gonzales, and Monica Davis ("Plaintiffs") on the one hand, and Defendants Housing Authority Of The County Of Kern ("HACK") and Stephen Pelz, in his official capacity as Executive Director of the Housing Authority of the County of Kern ("Defendants"), on the other.  Plaintiffs and Defendants are collectively referred to as the "Parties."

### RECITALS

WHEREAS, on or about May 20, 2014, Plaintiffs, through counsel, filed a complaint in the United States District Court for the Eastern District of California, resulting in the case entitled *Murphy, et al. v. Housing Authority of the County of Kern, et al.*, No. 1:14-CV-00776-JLT (the "Federal Action"); and

WHEREAS, in order to avoid the inconvenience and expense of litigation, and without making any admissions to each other, the Parties have agreed to settle all existing and potential disputes among them arising from the Federal Action.

WHEREAS, the parties desire to reach a full and final settlement of the Federal Action which this Agreement memorializes.

### AGREEMENT

The Parties, intending to be legally bound and in exchange for valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, agree as follows:

1.      *Mutual Releases.*  Plaintiffs, on their own behalf and on behalf of their agents and representatives hereby release, acquit, and discharge Defendants, and their affiliates or divisions, direct and indirect subsidiaries and parent organizations, related entities, together with their respective directors, officers, employees, attorneys, agents, insurers, representatives, beneficiaries, trusts, trustees, subsidiary trusts, parent trusts, executors, administrators, predecessors, successors, assigns, partners, members, vendors, distributors, sub-distributors,

licensees, wholesalers, retailers, exhibitors, independent contractors, production companies, public relations firms, advertising agencies, and anyone else involved in any way in any activity related to the Federal Action (collectively, "Releasees"), from and against any and all claims, demands, obligations, liabilities, expenses, damages, and causes of action, of any nature whatsoever, at law or in equity, , arising from or related in any way to the Federal Action (collectively, the "Released Claims"), except as set forth in this Agreement.

Defendants, on behalf of themselves and their affiliates or divisions, direct and indirect subsidiaries and parent organizations, related entities, together with their respective directors, officers, employees, attorneys, agents, insurers, representatives, beneficiaries, trusts, trustees, subsidiary trusts, parent trusts, executors, administrators, predecessors, successors, assigns, partners, members, vendors, distributors, sub-distributors, licensees, wholesalers, retailers, exhibitors, independent contractors, production companies, public relations firms, advertising agencies, and anyone else involved in any way in any activity related to the Federal Action (collectively, "Defendant Releasors") hereby release, acquit, and discharge Plaintiffs, their agents, attorneys, representatives, next of kin, heirs, beneficiaries, trusts, trustees, executors, administrators, and assigns (collectively, "Plaintiff Releasees"), from and against any and all claims, demands, obligations, liabilities, expenses, damages, and causes of action, of any nature whatsoever, at law or in equity, arising from or related in any way to the Federal Action except as set forth in this Agreement.

2.     *HACK will restore vouchers to all Plaintiffs.*  HACK hereby reinstates Plaintiffs' assistance under the Section 8 Program provided they continue to be eligible.  In assessing each Plaintiff's current eligibility for Section 8 assistance:

    a) HACK will not deem any Plaintiff ineligible based on any negative information on her application related to or resulting from prior termination from the Section 8 Program;

    b) HACK will issue its determination on each individual Plaintiff as to whether each Plaintiff is eligible for Section 8 assistance within five (5) business days or ten (10)

calendar days of approval of a complete application being submitted subject to full and complete cooperation of Plaintiffs and HACK's ability to verify information through third party sources;  and

c) When a Plaintiff requests that HACK inspect a potential rental property, HACK will inspect the property and issue its decision on whether the property meets HACK's Housing Quality Standards within ten (10) business days of receiving the request, and take all required steps to approve the tenancy and execute a HAP contract within five (5) business days of determining that the property has passed inspection.  The foregoing is subject to the full and complete cooperation of Plaintiffs and of third parties not under the control of either HACK or Plaintiffs.

3.     *HACK will hire professional hearing officers.*  HACK will contract with one or more hearing officers who are not affiliated with HACK and who are knowledgeable in the areas of federally subsidized housing, landlord/tenant law, fair housing and basic constitutional principles to act as hearing officers for termination hearings. HACK will consult Plaintiffs' counsel when assessing proposals submitted to its current "Request for Proposals for Housing Choice Voucher (Section 8) Hearing Officer Services."

4.     *HACK will revise its Administrative Plan.*  As reflected in the changes outlined in the attached exhibits, HACK will revise Chapter 8 (Determination of Income, Annual Recertification and Interim Reexaminations), Chapter 9 (Rent and Housing Assistance Payment Utility Allowance), Chapter 10 (Program integrity, denial or termination of assistance, evictions and termination of contracts owner claims); Chapter 11 (Informal reviews and informal hearings); Chapter 12 (Housing Authority, Owner and Participant Responsibilities and Obligations) and the VAWA appendix.

5.     *HACK will take all necessary steps to implement the revised Administrative Plan.*  HACK will take all necessary and appropriate steps to implement the above changes to the Administrative Plan within sixty (60) days of the Board's approval of this Settlement Agreement, which implementation shall include but not be limited to:

a) Revising all notices and forms related to the termination and informal hearing process to the extent necessary to comply with changes in the Administrative Plan;

b) Providing comprehensive training to all Section 8 and Applications staff regarding the changes to the Administrative Plan;

c) Providing comprehensive training to all Section 8 Applications and Housing Manager staff regarding the 2013 VAWA Reauthorization.

6. *Plaintiffs' attorneys' fees:* HACK shall pay Plaintiffs' counsel $20,000 for attorney fees within thirty (30) days following approval of this Settlement Agreement by the Board and Plaintiffs. Payment to be made to Western Center on Law and Poverty for distribution among counsel.

7. Upon execution of this Settlement Agreement, and performance of paragraphs four (4) and six (6) above, Plaintiffs and their attorneys shall immediately deliver to Defendants' counsel a dismissal with prejudice dismissing this action as to both Defendants, Housing Authority of the County of Kern and Stephen Pelz, in his official capacity as Executive Director of the Housing Authority of the County of Kern, and all Doe Defendants, 1 to 10. The order dismissing this case shall include approval of this Agreement and an order for its performance. Any dispute arising under this Agreement shall be a proceeding before Magistrate Judge Jennifer L. Thurston. If Judge Thurston is not available, then such proceeding shall be before whichever magistrate or judge is acting in her stead.

8. *No Admission.* This Agreement shall not be construed as an acknowledgment or admission of any liability or wrongdoing by Defendants or any other Release, and the Parties expressly agree that this Agreement is made for the sole purpose of compromising claims which are disputed as to validity and amount.

9. This Agreement, and all claims and controversies arising out of or related to this Agreement, shall be governed by the substantive law of the State of California and of the United States of America without regard to California conflict of laws principles.

10.     The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly construed for or against any Party.  The Parties agree that this Agreement shall be deemed to have been jointly drafted for purposes of applying any rules of construction.

11.     If any provision of this Agreement is held to be invalid or unenforceable, such invalidations or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, provided that each Party still receives the benefits of the releases, warranties, and payments provided herein.  However, in any action brought for breach of this Agreement by any of the Parties, the prevailing Party (or Parties) shall be awarded its (or their) attorneys' fees and costs.

12.     *Entire Agreement.*  This Agreement reflects the entire agreement between the Parties.  The execution and delivery of this written Agreement supersedes any and all other representations, negotiations or agreement pertaining to the subject matter herein.  The Agreement may not be modified in any way except by written amendment hereto, which shall be expressly designated as an amendment hereto, and require the written consent of all Parties hereto.

13.     This Agreement may be signed in counterparts that are provided to the other Parties by facsimile or by electronic mail transmission of a copy of the executed document, each of which shall be deemed an original, and all counterparts so executed shall constitute one Agreement binding on all of the Parties, notwithstanding that all of the Parties are not signatory to the same counterpart.

14.     *Reserved Jurisdiction.*  The Parties stipulate that the court may enter judgment pursuant to the terms of this Agreement and will retain jurisdiction over the parties to enforce the settlement until performance in full of its terms.

15.     *Confidentiality.*  The Parties agree to treat this document as confidential and will not disclose it unless required by law or court order.   Notwithstanding the foregoing, the terms

of the Agreement will not be treated as confidential as the Parties agree to issue a joint press release describing the settlement in a positive light as attached hereto.

16.    *Non-Disparagement.*  With respect to the subject matter of this Federal Action, all Parties and their counsel agree that they will not make any disparaging statements, written or oral, or engage in any disparaging communication about any opposing Party or any opposing Party's representatives or employees, or any opposing Party's work, professional conduct or business. The statement, comment or communication does not have to be false to be considered disparaging.  The Parties intend that this Non-Disparagement provision be enforceable.  If a Party believes disparagement has occurred, that Party shall contact the other Party and the Parties shall meet and confer to attempt to resolve the issue.  If the other Party refuses or fails to respond or upon the expiration of seventy two (72) hours the Parties have not resolved the issue, whichever first occurs, the party claiming breach may seek redress in court.


_____
STEPHEN PELZ
Individually and on behalf of HOUSING AUTHORITY
OF THE COUNTY OF KERN


_____
BRITTNEY MURPHY
PLAINTIFF


_____
JANE DOE
PLAINTIFF


_____
PATRICIA AZEVEDO
PLAINTIFF

of the Agreement will not be treated as confidential as the Parties agree to issue a joint press release describing the settlement in a positive light as attached hereto.

16.    *Non-Disparagement.* With respect to the subject matter of this Federal Action, all Parties and their counsel agree that they will not make any disparaging statements, written or oral, or engage in any disparaging communication about any opposing Party or any opposing Party's representatives or employees, or any opposing Party's work, professional conduct or business. The statement, comment or communication does not have to be false to be considered disparaging. The Parties intend that this Non-Disparagement provision be enforceable. If a Party believes disparagement has occurred, that Party shall contact the other Party and the Parties shall meet and confer to attempt to resolve the issue. If the other Party refuses or fails to respond or upon the expiration of seventy two (72) hours the Parties have not resolved the issue, whichever first occurs, the party claiming breach may seek redress in court.

---

STEPHEN PELZ
Individually and on behalf of HOUSING AUTHORITY
OF THE COUNTY OF KERN

---

BRITTNEY MURPHY
PLAINTIFF

---

JANE DOE
PLAINTIFF

---

PATRICIA AZEVEDO
PLAINTIFF

ANDREA GONZALES
PLAINTIFF

MONICA DAVIS
PLAINTIFF

APPROVED AS TO FORM AND CONTENT:

WALL, WALL & PEAKE

By: _____
    ALAN J. PEAKE
    Attorneys for Defendants

GREATER BAKERSFIELD
LEGAL ASSISTANCE, INC.

By: _____
    CELIDA B. MIRAMONTES
    Attorneys for Plaintiffs

WESTERN CENTER ON
LAW AND POVERTY

By: _____
    MADELINE S. HOWARD
    Attorneys for Plaintiffs

ANDREA GONZALES
PLAINTIFF


MONICA DAVIS
PLAINTIFF


APPROVED AS TO FORM AND CONTENT:

WALL, WALL & PEAKE

By: _____
    ALAN J. PEAKE
    Attorneys for Defendants


GREATER BAKERSFIELD
LEGAL ASSISTANCE, INC.

By: _____
    CELIDA B. MIRAMONTES
    Attorneys for Plaintiffs


WESTERN CENTER ON
LAW AND POVERTY

By: _____
    MADELINE S. HOWARD
    Attorneys for Plaintiffs

of the Agreement will not be treated as confidential as the Parties agree to issue a joint press release describing the settlement in a positive light as attached hereto.

16.     *Non-Disparagement.*  With respect to the subject matter of this Federal Action, all Parties and their counsel agree that they will not make any disparaging statements, written or oral, or engage in any disparaging communication about any opposing Party or any opposing Party's representatives or employees, or any opposing Party's work, professional conduct or business. The statement, comment or communication does not have to be false to be considered disparaging.  The Parties intend that this Non-Disparagement provision be enforceable.  If a Party believes disparagement has occurred, that Party shall contact the other Party and the Parties shall meet and confer to attempt to resolve the issue.  If the other Party refuses or fails to respond or upon the expiration of seventy two (72) hours the Parties have not resolved the issue, whichever first occurs, the party claiming breach may seek redress in court.


_____
STEPHEN PELZ
Individually and on behalf of HOUSING AUTHORITY
OF THE COUNTY OF KERN



_____
BRITTNEY MURPHY
PLAINTIFF



_____
JANE DOE
PLAINTIFF



_____
PATRICIA AZEVEDO
PLAINTIFF

ANDREA GONZALES
PLAINTIFF


MONICA DAVIS
PLAINTIFF


APPROVED AS TO FORM AND CONTENT:

WALL, WALL & PEAKE

By: _____
      ALAN J. PEAKE
      Attorneys for Defendants


GREATER BAKERSFIELD
LEGAL ASSISTANCE, INC.

By: _____
      CELIDA B. MIRAMONTES
      Attorneys for Plaintiffs


WESTERN CENTER ON
LAW AND POVERTY

By: _____
      MADELINE S. HOWARD
      Attorneys for Plaintiffs

# EXHIBITS TO SETTLEMENT AGREEMENT

Murphy, et al. v. Housing Authority of the County of Kern, et al.,
Case No. 1:14-CV-00776-JLT

Chapter 8 – Administrative Plan

Chapter 9 – Administrative Plan

Chapter 10 – Administrative Plan

Chapter 11 – Administrative Plan

Chapter 12 – Administrative Plan

Appendix 8 – Administrative Plan

Joint Press Release

# Chapter 8 – Administrative Plan

**Chapter 8**

**DETERMINATION OF INCOME**
**ANNUAL RECERTIFICATION AND INTERIM REEXAMINATIONS**

*Cross Reference: 24 CFR Part 5, Subparts E and F; 24 CFR 982

## 8-A.   ANNUAL INCOME

To determine annual income, HACK counts the income of all family members, excluding the types and sources of income that are specifically excluded. Once the annual income is determined, the HACK subtracts out all allowable deductions (allowances) as the next step in determining the Total Tenant Payment (TTP).

1.   Annual income means all amounts, monetary or not, that:

    a.   Go to (or on behalf of) the family head or spouse (even if temporarily absent) or to any other family member, or

    b.   Are anticipated to be received from a source outside the family during the 12-month period following admission or annual reexamination effective date; and

    c.   Are not specifically excluded from annual income.

2.   Annual income includes, but is not limited to:

    a.   The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services.

    b.   The net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness are not used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight-line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession is included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family.

    c.   Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness are not used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight-line

Housing Choice Voucher Administrative Plan                Revised: 01/2015
Housing Authority of the County of Kern                Board Approved: 02/11/2015
Chapter 8 Page 1

depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from an investment is included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income includes the greater of the actual income derived from all net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD.

d.      The full amount of periodic amounts received from Social Security, annuities, insurance policies, retirement funds, pensions, disability or death benefits, and other similar types of periodic receipts, including a lump-sum amount or prospective monthly amounts for the delayed start of a periodic amount. (However, deferred periodic amounts from supplemental security income and Social Security benefits that are received in a lump sum amount or in prospective monthly amounts are excluded.)

e.      Payments in Lieu of earnings, such as unemployment and disability compensation, worker's compensation and severance pay.  (However, lump sum additions such as insurance payments from worker's compensation are excluded.

f.      Welfare assistance.

    1.      If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustment by the welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare assistance income to be included as income consists of:

        a.      The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

        b.      The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this requirement is the amount resulting from one application of the percentage.

    2.      If the amount of welfare is reduced due to an act of fraud by a family member or because of any family member's failure to comply with requirements to participate in an economic self-sufficiency program or work activity, the amount of rent required to be paid by the family will not be decreased.  In such cases, the amount of income attributable to the family will include what the family would have received had they complied with the welfare requirements and/or had not committed an act of fraud.

      3.      If the amount of welfare assistance is reduced as a result of a lifetime time limit, the reduced amount is the amount that shall be counted.

g.      Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from organizations or from persons not residing in the dwelling.

h.      All regular pay, special pay, and allowances of a member of the Armed Forces. (Special pay to a member exposed to hostile fire is excluded.)

## 8-B   EXCLUSIONS FROM INCOME

Annual income does not include the following:

1.      Income from employment of children (including foster children under the age of 18 years;

2.      Payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone);

3.      Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation) capital gains and settlement for personal property losses;

4.      Amounts received by the family that is specifically for, or in reimbursement of, the cost of medical expenses for any family member;

5.      Income of a live-in aide;

6.      The full amount of student financial  assistance paid directly to the student or to the educational institution;

7.      The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

8.      The amounts received from the following programs:

a.      Amounts received under training programs funded by HUD;

b.      Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

Housing Choice Voucher Administrative Plan                                      Revised:  01/2015
Housing Authority of the County of Kern                                Board Approved:  02/11/2015
Chapter 8 Page 3

c.     Amounts received by a participant in other publicly assisted programs that are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and that are made solely to allow participation in a specific program;

d.     Amounts received under a resident service stipend. A resident service stipend is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the Housing Authority or owner, on a part-time basis, that enhances the quality of life in the development. Such services may include, but are not limited to, fire patrol, hall monitoring, lawn maintenance, and resident initiative coordination. No resident may receive more than one such stipend during the same period of time;

e.     Incremental earnings and benefits resulting to any family member from participation in qualifying State or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives and are excluded only for the period during which the family member participates in the employment training program;

f.     Temporary, non recurring, or sporadic income (including gifts);

g.     Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

h.     Earnings in excess of $480 for each full-time student 18 years old or older (excluding the head of household and spouse);

i.      Adoption assistance payments in excess of $480 per adopted child;

j.     Deferred periodic amounts from Supplemental Security Income and Social Security benefits that are received in a lump sum amount or in prospective monthly amounts;

k.     Amounts received by the family in the form of refunds or rebates under State or local law for property taxes paid on the dwelling unit;

l.     Amounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; or

m.     Amounts specifically excluded by any other Federal statute from consideration as income for purposes of determining eligibility or benefits.

These exclusions include:

1.      The value of the allotment of food stamps

2.      Payments to volunteers under the Domestic Volunteer Services Act of 1973

3.      Payments received under the Alaska Native Claims Settlement Act

4.      Income from sub-marginal land of the U.S. that is held in trust for certain Indian tribes

5.      Payments made under HSS's Low-Income Energy Assistance Program

6.      Payments received under the Job Training Partnership Act

7.      Amount of scholarships awarded under Title IV including Work-Study

8.      Payments received under the Older Americans Act of 1965

9.      Payments from Agent Orange Settlement

10.     The value of child care under the Child Care and Development Block Grant Act of 1990

11.     Earned income tax credit refund payments

12.     Payments for living expenses under the AmeriCorps Program


## 8-C.     DEDUCTIONS FROM ANNUAL INCOME

The following deductions will be made from annual income:

1.      $480 for each dependent

2.      $400 for any elderly family or disabled family

3.      For any family that is not elderly or disabled but has a member (other than the head or spouse) who is a person with a disability, disability assistance expenses in excess of 3% of annual income. This allowance may not exceed the employment income received by family members who are 18 years of age or older as a result of the assistance to the person with disabilities.

4.      For any elderly or disabled family:

    a.       That has no disability assistance expenses, an allowance for medical expenses equal to the amount by which the medical expenses exceed 3% of annual income;

    b.       That has disability expenses greater than or equal to 3% of annual income, an allowance for disability assistance expenses computed in accordance with paragraph C, plus an allowance for medical expenses that equal the family's medical expenses;

    c.       That has disability assistance expenses that are less than 3% of annual income, an allowance for combined disability assistance expenses, and medical expenses that is equal to the total of these expenses less 3% of annual income.

5.      Child care expenses.

## 8-D    RECEIPT OF INFORMATION REGARDING OVERPAYMENT

If a Section 8 participant receives a letter or notice from HUD concerning the amount or verification of family income, the letter shall be brought to the person responsible for income verification within thirty (30) days of receipt by the participant.

HACK shall reconcile any difference between the amount reported by the participant and the amount listed in the HUD communication. This shall be done as promptly as possible.

After the reconciliation is complete, HACK shall adjust the participant's rental contribution beginning at the start of the next month unless the reconciliation is completed during the final five
(5) days of the month and then the new rent shall take effect on the first day of the second month following the end of the current month. In addition, if the participant had not previously reported the proper income, HACK will attempt to meet and confer with the participant regarding the reason for not reporting the income and make a reasonable effort to obtain full repayment of excess rental assistance.

In cases of unreported income depending upon the extent and nature of the circumstances, HACK will take action to remedy the situation by one or more of the following:

Collect a lump payment of the entire amount paid by the agency on behalf of the participant.

Establish a repayment plan for the participant to pay the sum due to the agency. If HACK offers a repayment agreement, the terms may not require prohibitive payments that would force the family to leave the program (HCV Program Guidelines 22-13).

The family executes a payment agreement.

Terminate the participant from the program for failure to report income and/or misrepresenting

Housing Choice Voucher Administrative Plan                             Revised:  01/2015
Housing Authority of the County of Kern                        Board Approved: 02/11/2015
Chapter 8 Page 6

the circumstances surrounding the unreported income.   In determining whether to terminate assistance because of action or failure to act by members of the family, HACK may consider the extent of participation or culpability of individual family members, any mitigating circumstances such as those related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved before initiating termination procedures.

## 8-E.  COOPERATING WITH WELFARE AGENCIES

HACK will make its best efforts to enter into cooperation agreements with local welfare agencies under which the welfare agencies will agree:

To target assistance, benefits and services to families receiving assistance in the public housing and Section 8 tenant-based assistance program to achieve self-sufficiency.

To provide written verification to HACK concerning welfare benefits for families applying for or receiving assistance in our housing assistance programs.

## 8-F  ANNUAL RE-CERTIFICATION

At least annually, HACK will reexamine the income, composition, and extent of medical or other unusual expenses of each assisted family to determine eligibility for continued assistance under the program and to determine whether appropriate adjustments to be made in the Total Tenant Payment (TTP) (the family's share of the applicable Rent to Owner), the correct family subsidy based on the unit size, and the HAP to be made by HACK. Families are required to comply with HACK's request for any applicable information regarding income, family composition or persons residing in the assisted housing, including criminal history of family members over 18 years of age since the last annual recertification. Failure of the family to cooperate (which may include failure to appear at scheduled interview appointments or to reschedule prior to an appointment, or provide access to the housing for the annual inspection) is a basis on which HACK may terminate assistance to a family.

HACK will send a notification letter to the family letting them know that it is time for their annual reexamination and scheduling an appointment. The letter includes forms for the family to complete in preparation for the interview. The letter provides instructions in preparation for the appointment including the time frame for permitting the family to reschedule the interview if necessary. The letter informs families who may need to make alternate arrangements due to a disability that they may contact staff to request an accommodation of their needs.

Reexaminations will be conducted within twelve (12) months of the anniversary date of admission. The effective date of the reexamination will be established as the anniversary of the effective date of the initial housing lease.

During the interview, the family will provide all information regarding income, assets, expenses, and other information necessary to determine the family's share of rent. The family will sign the HUD consent form and other consent forms that later will be mailed to the sources that will verify the family circumstances.

After the tenant's eligibility status and family income have been determined, an appropriate redetermination shall be made of the amounts of TTP and, the amount of the HAP per established policies. The family and owner shall be notified accordingly.

A family's eligibility for HAP shall continue until the amount payable by the family equals the Gross Rent for the housing they occupy for a period of six (6) months. However, the termination of eligibility at such point shall not affect the families other rights under its lease nor shall such termination preclude resumption of payments as a result of later changes in the income or rents or other relevant circumstances during the six (6) month period. If six (6) months have elapsed since the date of the last HAP, the Contract shall be terminated.

A family may, at any time, request a re-determination of its TTP on the basis of changes in family income or other relevant circumstances.

1.      The new family share will generally be effective upon the anniversary date with 30 days' notice of any rent increase to the family.

        If the rent determination is delayed due to a reason beyond the control of the family, then any rent increase will be effective the first of the month after the month in which the family receives a 30 day notice of the amount. If the new rent is a reduction and the delay is beyond the control of the family, the reduction will be effective as scheduled on the anniversary date.

        If the family caused the delay, then any increase will be effective on the anniversary date. Any reduction will be effective the first of the month after the rent amount is determined.

        If the family fails to respond to the letter and fails to attend the interview, a second letter will be mailed. The second letter will advise the family of a new time and date for the interview, allowing for the same considerations for rescheduling and accommodation as above. The letter will also advise the family that failure by the family to attend the second scheduled interview may result in HACK taking action to terminate the family's assistance.

## 8-G.      INTERIM RE-EXAMINATIONS

No rent adjustments are to be effected between dates of periodic reexaminations or annual reexaminations except as provided in paragraphs l and 2 below.

1.      In addition to submitting such information as may be required at the time of periodic reexaminations (or special reexamination) of eligibility and re-determination of family

income, tenants are required to report the following defined changes in writing within ten (10) business days;

a.      Loss of lessee through death, divorce, other continuing circumstances, or addition of a family member (by marriage, remarriage or otherwise).

In circumstances of a family break-up, HACK will make a determination of which family member will retain the voucher, taking into consideration the following factors:

1.      To whom the voucher was issued.

2.      The interest of minor children or of ill, elderly, or disabled family members.

3.      Whether the assistance should remain with the family members remaining in the unit.

4.      Whether family members were forced to leave the unit as a result of actual or threatened physical violence by a spouse or other member(s) of the household.  (Refer to the Appendix to XIII of this Plan titled "Prohibition Against Denial of Assistance to Victims of Domestic Violence, Dating Violence, Sexual Assault, and Stalking" for additional provisions regarding protections for victims of domestic violence, dating violence, sexual assault, and stalking.)

If a court determines the disposition of property between members of the assisted family in a divorce or separation under a settlement of judicial decree, HACK will be bound by the court's determination of which family members continue to receive assistance in the program.

Because of the number of possible different circumstances in which a determination will have to be made, HACK will make determinations on a case-by-case basis.

b.      Commencement or discontinuance of any income from any source, including government benefits, retirement or pensions, employment or unemployment, including commencement of receipt of earnings or other income by any family member not previously having income

c.      Receipt or disposition of any assets including real property, stocks, bonds, securities, lump sum payments including lotteries, gambling, etc.

2.      Any tenant who reports a change in his/her family circumstance shall be given an interim

change report to determine if a new Total Tenant Payment (TTP) adjustment is needed. Where the TTP is decreased per this provision, the tenant shall be required to report all income increases, which occur before the next re-examination. Failure to report the changes set forth in paragraph 8, I will require a retroactive adjustment of TTP when necessary.

a.      Automatic adjustments and income re-determination will be completed for the following reasons:

- Decrease in income

- Increase for zero income clients

- Size or composition changes (i.e. adding, removing clients)

- Family Self Sufficiency Program

b.      Decreases in the TTP are to be effective the first day of the month following the month in which the change was reported; however, no downward adjustment of TTP is to be processed until all the facts have been verified.

c.      Increases in TTP that are determined to be interims are to be made effective the first day of the second month following the month in which the change occurred (retroactively, if necessary)

d.      All other changes will be calculated and processed to be effective at the next annual re-certification.


## 8-H.   SPECIAL RE-EXAMINATIONS

If, at the time of admission or re-certification, a family is clearly of low income, and it is not possible to make an estimate of family income for the next twelve (12) months with any degree of accuracy because:

1.      A tenant is unemployed and there are no anticipated prospects of employment; or

2.      The conditions of employment and/or receipt of income are so unstable as to invalidate usual and normal standards of determination.

A special reexamination shall be scheduled for a specified time (either 30, 60, 90 or 120 days) depending upon HACK's estimate of time required for the family circumstances to stabilize. If, at the time of such special reexamination, it is still not possible to make a reasonable estimate of family income, the special reexamination shall continue to be scheduled or conducted until such time as a reasonable estimate of family income can be made for the next twelve (12) months.

If a family's past employment has been sporadic and such an income pattern is expected to

continue, a reasonable twelve (12) months' estimate of the family's income may be based upon present rate of income. Special reexaminations must be clearly set for a definite time and controls established to assure compliance.

## 8-I.    RE-EXAMINATION PROCEDURES

Data assembled at the time of the reexamination are to be filed in the folder set up for the family at the time of its admission. Reexamination and interim re- determination information will be recorded on HUD form 50058, Certification/Re-certification of Tenant Eligibility.

The lower-income family limits do not apply as a test for income eligibility of an assisted family at reexamination; however, the family's eligibility income must still be computed to determine if the family is Very-Low Income.

The sources of income and assets listed on the Certification/Re-certification of Tenant Eligibility form should be carefully compared to the initial certification (or most recent reexamination application, if applicable), to insure that no items have been omitted or improperly explained.

Written or oral third-party verification of all information applicable to determining the family's new TTP must be obtained unless HACK provides written documentation that the third-party verification is impossible to obtain as discussed in Chapter 2.

Careful assessment of any changes in family composition must be made to determine whether the family will be required to move and, if so, within a reasonable period of time.

The same procedures used for the initial determination of the TTP for the initial HAP contract are also applicable at the time of reexamination. In computing the TTP and HAP, the following important points will be observed:

1.    TTP listed will be the new figure (if changed) as computed on the Certification/Re-certification of Eligibility.

2.    Staff will determine that the appropriate utility allowance is being used, based on the utilities and services which are tenant- supplied, and which are applicable to the actual housing size and type occupied.

3.    If reexaminations are coordinated with HAP contract anniversary or termination dates, any HACK-approved changes in the Rent to Owner must be used, along with any utility allowance changes that may be effective, to arrive at the new Rent to Owner and subsequent determinations of HAP levels.

## 8-J.    NOTIFICATION OF REEXAMINATION RESULTS

Once the reexamination process has been completed, the family will be notified of its continued eligibility for assistance.

If a family has been determined ineligible for continued assistance, the family must be notified in writing with a statement of the reasons and offered the opportunity to request an informal hearing.-In addition, if the HAP contract is expiring at the time of re-examination, it cannot be renewed and the family and the owner must both be informed, in writing, of the termination date. If the family desires to continue in occupancy, the owner and family must make their own separate leasing arrangement.

If a family has been determined eligible for continued assistance, the family and owner must be notified, in writing, of any applicable changes in the amount of the HAP to be made by HACK, the amount of the tenant's portion of the Rent to Owner, HACK's portion of the Rent to Owner, and the effective date of the changes. For re-certification which is coordinated with HAP contract anniversary or termination dates, any applicable HACK-approved changes to the Rent to Owner that will also affect each parties contribution to the rent shall be incorporated in the same notice.

If a family has been determined eligible for continued assistance but must move to other housing because of overcrowding or under- utilization, they will be notified. The notice will inform the family of their right to request an exception to the occupancy standards, and the reasons for which an exception may be granted.

Unless there is a delay in reexamination processing not caused by the family, any rent increase will be effective the first of the second month after the month in which the family receives notice of the new rent amount. If the family causes a delay, then the rent increase will be effective on the date it would have been effective had the process not been delayed (even if this means a retroactive increase).

If the new rent is a reduction and any delay is beyond the control of the family, the reduction will be effective the first of the month after the interim reexamination should have been completed.

If the new rent is a reduction and the family caused the delay or did not report the change in a timely manner, the change will be effective the first of the month after the rent amount is determined.

All notices described in this Chapter shall be considered vital documents and shall be translated into the family's primary language, if other than English, in accordance with HACK's Limited English Proficiency Plan ("LEP").

# Chapter 9 – Administrative Plan

**Chapter 9**

**RENT AND HOUSING ASSISTANCE
PAYMENT UTILITY ALLOWANCE**

*Cross Reference: 24 CFR 982.502; 24 CFR 5.630 (b) (2) (ii) (A) (B)

………………………………………………………………………………………………

## 9A.   GENERAL

After October **1,** 1999, HACK will issue only vouchers to applicants, movers, and families entering the jurisdiction through portability. Certificates currently held will continue to be honored until the transition of the merger of the Section 8 Certificate and Voucher programs as outlined in CFR 982.502 is complete (see for Chapter 6 for additional guidance).

## 9B.   RENT REASONABLENESS

HACK will not approve an initial rent or a rent increase in any of the tenant-based programs without determining that the rent amount is reasonable. Reasonableness is determined prior to the initial lease and at the following times:                              .

1.     Before any increase in rent to owner is approved;

2.     If 60 days before the contract anniversary date there is a 5% decrease in the published FMR as compared to the previous FMR; and

3.     If HACK or HUD directs that reasonableness be re-determined.

## 9C.   COMPARABILITY

In making a rent reasonableness determination, HACK will compare the rent for the unit to the rent of comparable units in the same or comparable neighborhoods. HACK will consider the location, quality, size, number of bedrooms, age, amenities, housing services, maintenance and utilities of the unit and the comparable units.

HACK will maintain current survey information on rental units in the jurisdiction. HACK will also obtain from landlord associations and management firms the value of the array of amenities.

Owners are invited to submit information to the survey at any time. Owners may review the determination made on their unit and may submit additional information or make improvements to the unit that will enable HACK to establish a higher value.

The owner must certify the rents charged for other units. By accepting the housing assistance payment each month the owner is certifying that the rent to owner is not more than the rent charged by the owner for comparable unassisted units in the premises.

**9D.   MAXIMUM SUBSIDY**

The Fair Market Rent (FMR) is published by HUD or the exception payment standard rent (if requested by HACK and approved by HUD) determines the maximum subsidy for a family.

For a regular tenancy under the Certificate Program, the FMR exception rent limit is the maximum initial gross rent under the assisted lease. This only applies until the transition of the merger of the Section 8 Certificate and Voucher programs as outlined in 24 CFR 982.502 is complete.

For the Voucher Program, the maximum payment standard will be 110% of the FMR without prior approval from HUD, or the exception payment standard approved by HUD.

For a voucher tenancy in an insured or non-insured 236 project, a 515 project of the Rural Development Administration, or Section 221(d)(3) below market interest rate project the payment standard may not exceed the basic rent charged including the cost of tenant-paid utilities.

For a manufactured home space rental, the maximum subsidy under any form of assistance is the Fair Market Rent for the space as outlined in 24 CFR 982.888.

1.      Setting the Payment Standard

HUD requires the payment standard be set by HACK at between 90 and 110% of the FMR. HACK will review its determination of the payment standard annually after publication of the FMRs. HACK will consider vacancy rates and rents in the market area, size and quality of units leased under the program, rents for units leased under the program, success rates of voucher holders in finding units, and the percentage of annual income families are paying for rent under the Voucher Program. If it is determined that success rates will suffer or that families are having to rent low quality units or pay over 40% of income for rent, the payment standard may be raised to the level judged necessary to alleviate these hardships.

Payment standards will not be raised solely to allow the renting of luxury quality units.

If successful levels are projected to be extremely high and rents are projected to be at or below 30% income, HACK will reduce the payment standard. Payment standards for each bedroom size are evaluated separately so that the payment standard for one bedroom size may increase or decrease while another remains unchanged. HACK may consider adjusting payment standards at times other than the annual review when circumstances warrant.

Before increasing any payment standard, HACK will conduct a financial feasibility test

to ensure that in using the higher standard, adequate funds will continue to be available to assist families in the program.

2.      Selecting the Correct Payment Standard for a Family

    a.      For the Voucher tenancy, the payment standard for a family is the lower of:

        i.      The payment standard for the family unit size; or

        ii.      The payment standard for the unit size rented by the family.

    b.      If the unit rented by a family is located in an exception rent area, HACK will use the appropriate payment standard for the exception rent area.

    c.      If there is a change in family unit size resulting from a change in family size or composition, the new family unit size will be considered when determining the payment standard at the next annual reexamination.

3.      Area Exception Rents

    In order to help families find housing outside areas of high poverty or when voucher holders are having trouble finding housing for lease under the program, HACK may request that HUD approve an exception payment standard rent for certain areas within its jurisdiction. The areas may be of any size, though generally not smaller than a census tract. HACK may request one such exception payment standard area or many. Exception payment standard rent authority may be requested for all or some unit sizes, or for all or some unit types.

    When an exception payment standard rent has been approved and the FMR increases, the exception rent remains unchanged until such time as HACK requests and HUD approves a higher exception payment standard rent. If the FMR decreases, the exception payment standard rent authority automatically expires.

## 9E.      ASSISTANCE AND RENT FORMULAS

1.      Total Tenant Payment

    The total tenant payment (TTP) is equal to the highest of:

    a.      10% of monthly income

    b.      30% of adjusted monthly income

    c.      Minimum rent

    d.      The welfare rent

---

Plus any rent above the payment standard.

2.      Minimum Rent

The minimum rent is $50.00. However, if the family requests a hardship exemption,

(A)     HACK will suspend the minimum rent for the family beginning the month following the family's hardship request.  HACK staff will request documentation of the hardship and will promptly determine whether there is a qualifying financial hardship, and whether such hardship is temporary or long term. (24 C.F.R. 5.630(b)(2)(ii)(A).) During the suspension, the family will not be required to pay a minimum rent and the Housing Assistance Payment will be increased accordingly.

a.      A hardship exemption may must be requested through a written form indicating that the tenant is unable to pay the rent due to a hardship.  If HACK becomes aware of information that a hardship may exist, HACK will provide the hardship exemption request form to the participant.  A hardship exists in the following circumstances (24 C.F.R. 5.630(b)):

1.      When the family has lost eligibility for or is awaiting an eligibility determination for a Federal, State or local assistance program**, i**ncluding a family that includes a member who is a noncitizen lawfully admitted for permanent residence under the Immigration and Nationality Act who would be entitled to public benefits but for title IV of the Personal Responsibility and Work Opportunity Act of 1996;

2.      When the family would be evicted because it is unable to pay the minimum rent;

3.      When the income of the family has decreased because of changed circumstances, including loss of employment;

4.      When a death has occurred in the family.

5.      Other circumstances determined by HACK or HUD.

b.      Temporary Hardship:

If HACK determines that there is a qualifying hardship but that it is of a temporary nature, the minimum rent will not be imposed for a period of 90 days from the date of the family's request. At the end of the 90-day period, minimum rent will be imposed retroactively to the time of suspension. HACK will offer a

reasonable repayment agreement for any minimum rent back payment paid by HACK on the family's behalf during the period of suspension.

c.    A family may not be entitled to a hardship exemption if the family's TANF benefits have been reduced due to sanctioning, fraud, failure to participate in an economic self-sufficiency program, or failure to comply with a work activity requirement. HACK staff must obtain written verification from the Dept. of Human Services in order to deny the hardship exemption.

d.    Long-term hardship

If HACK determines there is a long-term hardship, the family will be exempt from the minimum rent requirement until the hardship no longer exists.

e.    HACK will provide a Notice of Action concerning minimum rent including the tenant's right to an informal hearing (refer to Chapter 11 for additional notice and hearing requirements).

f.    Appeals

The family may use the informal hearing procedure to appeal HACK's determination regarding the hardship. No escrow deposit will be required in order to access the informal hearing procedures. Notice of the right to informal hearing will be pursuant to Chapter 11.

3.    Section 8 Merged Vouchers

a.    The payment standard is set by HACK between 90% and 110% of the FMR or higher or lower with HUD approval.

b.    The participant pays the greater of the Total Tenant Payment or the minimum rent, plus the amount by which the gross rent exceeds the payment standard.

c.    No participant, when initially receiving tenant-based assistance on a unit, shall pay more than 40% of their monthly adjusted income.

4.    Section 8 Preservation Vouchers

1.    Payment Standard

a.    The payment standard is lower of:

1.    The payment standard amount for the appropriate family unit size; or

2.    The payment standard amount for the size of the dwelling unit

actually rented by the family.

b.    If the dwelling unit is located in an exception area, HACK will use the appropriate payment standard for the exception area.

c.    At the next regular reexamination following a change in family composition that causes a change in family unit size during the HAP contract term, and for any examination thereafter during the term:

    1.    The new family unit size must be used to determine the payment standard.

2.    HACK will pay a monthly housing assistance payment on behalf of the family that equals the lesser of:

a.    The payment standard minus the total tenant payment; or

b.    The gross rent minus the total tenant payment.

5.    Manufactured Home Space Rental: Section 8 Vouchers

1.    The payment standard for a participant renting a manufactured home space is the published FMR for rental of a manufactured home space.

2.    The space rent is the sum of the following as determined by the Housing Authority:

a.    Rent to the owner for the manufactured home space;

b.    Owner maintenance and management charges for the space; and

c.    Utility allowance for tenant paid utilities.

    1.    The participant pays the rent to owner less the HAP.

    2.    HAP equals the lesser of:

        a.    The payment standard minus the total tenant payment; or

        b.    The rent paid for rental of the real property on which the manufactured home owned by the family is located.

6.    Rent for Families under the Non-Citizen Rule

A mixed family will receive full continuation of assistance if all of the following conditions are met:

1.      The family was receiving assistance on June 19, 1995;

2.      The family was granted continuation of assistance before November 29, 1996;

3.      The family's head or spouse has eligible immigration status; and

4.      The family does not include any person who does not have eligible status other than the head of household, the spouse of the head of household, any parent of the head or spouse, or any child (under the age of 18) of the head or spouse.

If a mixed family qualifies for prorated assistance but decides not to accept it, or if the family has no eligible members, the family may be eligible for temporary deferral of termination of assistance to permit the family additional time for the orderly transition of some or all of its members to locate other affordable housing. Under this provision the family receives full assistance. If assistance is granted under this provision prior to November 29, 1996, it may last no longer than three years. If granted after that date, the maximum period of time for assistance under the provision is 18 months. HACK will grant each family a period of 6 months to find suitable affordable housing. If the family cannot find suitable affordable housing, HACK will provide additional search periods up to the maximum allowable.

Suitable housing means housing that is not substandard and is of appropriate size for the family. Affordable housing means that it can be rented for an amount not exceeding the amount the family pays for rent, plus utilities, plus 25%.

The family's assistance is prorated in the following manner:

1.      Find the prorated housing assistance payment (HAP) by dividing the HAP by the total number of family members, and then multiplying the result by the number of eligible family members.

2.      Obtain the prorated family share by subtracting the prorated HAP from the gross rent (contract rent plus utility allowance).

3.      The prorated tenant rent equals the prorated family share minus the full utility allowance.

## 9F.      UTILITY ALLOWANCE

HACK maintains a utility allowance schedule for all tenant-paid utilities (except telephone), for cost of tenant-supplied refrigerators and ranges, and for other tenant-paid housing services (e.g., trash collection (disposal of waste and refuse)).

The utility allowance schedule is determined based on the typical cost of utilities and services

paid by energy-conservative households that occupy housing of similar size and type in the same locality. In developing the schedule, HACK uses normal patterns of consumption for the community as a whole and current utility rates.

HACK reviews the utility allowance schedule annually and revises any allowance for a utility category if there has been a change of 10% or more in the utility rate since the last time the utility allowance schedule was revised. HACK maintains information supporting the annual review of utility allowances and any revisions made in its utility allowance schedule.

HACK uses the appropriate utility allowance for the size of dwelling unit actually leased by the family (rather than the family unit size as determined under HACK subsidy standards).

At each reexamination, HACK applies the utility allowance from the most current utility allowance schedule.

HACK will approve a request for a utility allowance that is higher than the applicable amount on the utility allowance schedule if a higher utility allowance is needed as a reasonable accommodation to make the program accessible to and usable by the family member with a disability.

The utility allowance will be subtracted from the family's share to determine the amount of the Tenant Rent.  The Tenant Rent is the amount the family owes each month to the owner.  The amount of the utility allowance is then still available to the family to pay the cost of their utilities. Any utility cost above the allowance is the responsibility of the tenant. Any savings resulting from utility costs below the amount of the allowance belongs to the tenant.

## 9G.   DISTRIBUTION OF HOUSING ASSISTANCE PAYMENTS

HACK pays the owner the lesser of the Housing Assistance Payment (HAP) or the rent to owner. If payments are not made when due, the owner may charge HACK a late payment, agreed to in the Contract and in accordance with generally accepted practices in HACK's jurisdiction.

## 9H.   LATE FEE PAYMENT TO OWNER

All of the following conditions must be met before compensation will be made to the owner when Housing Assistance Payments are late:

1.   Payments will be made only after ten (10) days (beginning from the first working day of the month) has elapsed.

2.   Reimbursement will be in the amount of the actual late payment assessed (or equivalent loss) each owner and only to those who request it, in writing, to the Finance Department and provide documentation. In cases where only a percentage of the property is under Section 8 contract, the late fee will be prorated accordingly.

3.   Once envelopes are postmarked, our obligation satisfied. (The agency cannot be held

responsible for the United States Postal Service.)

4.      Not applicable in cases where HAP Funds are delayed from HUD. (The agency cannot be held responsible for HUD's actions. HAP Contracts with owners are contingent upon HUD's funding.)

5.      No payment of late fees will be made if the HAP Payment has been placed on Hold.

## 9-I.   CHANGE OF OWNERSHIP

HACK requires a written request by the owner who executed the HAP contract in order to make changes regarding who is to receive HACK's rent payment or the address as to where the rent payment should be sent.

In addition, HACK requires a written request from the new owner to process a change of ownership. The following documents must accompany the written request:

a.      Deed of Trust showing the transfer of title; and

b.      Tax Identification Number or Social Security Number.

New owners will be required to execute IRS form W-9. HACK may withhold the rent payment until the Taxpayer Identification Number is received.

# Chapter 10 – Administrative Plan

**Chapter 10**

**SECTION 8 PROGRAM INTEGRITY,
DENIAL OR TERMINATION OF ASSISTANCE, EVICTIONS AND TERMINATION
OF CONTRACTS
OWNER CLAIMS**

*Cross Reference:


## 10A.   PROGRAM INTEGRITY POLICY

The Housing Authority of the County of Kern (HACK) is committed to the prevention, detection and elimination of Section 8 Program abuse and fraud. Accordingly, the following policies and procedures will be observed in the administration of the Section 8 Program by HACK staff.

## 10B.   HANDLING OF INQUIRIES

Under no circumstances will an inquiry or investigation of an assisted family be undertaken arbitrarily. HACK's expectation is that assisted families will comply with HUD requirements and program rules, and that Section 8 staff will make every effort (formally and informally) to orient and educate all assisted families in order to avoid unintentional violations. However, HACK has a responsibility to HUD, the community and to eligible families in need of housing assistance, to monitor program Participants for compliance and, when indicators of possible abuse come to the attention of staff, to investigate such claims.

## 10C.   INITIATION OF INVESTIGATION

Section 8 staff will initiate an investigation of a program Participant only in the event of one or more of the following circumstances. All allegations of fraud or program abuse to HACK will be referred to the Investigations Division for follow-up investigation.

1.     Referrals, Complaints or Tips

The Section 8 staff will follow up on referrals from other agencies, companies or people which are received by mail, by telephone or in person, which allege that an assisted family is in non-compliance with, or otherwise violating program rules. Such follow-up will be made providing that the referral contains at least one item of information that is independently verifiable. A copy of the allegation will be placed in the tenant's file.

Housing Authority staff will, in all cases, request the name, telephone number, address, and relationship to the Participant family of the person making the referral, complaint, or tip and will retain such information. HACK will not solely base termination of a family's assistance on an anonymous tip.

2.      Internal File Review

A follow-up will be made if HACK staff discovers (as, a function of a certification, an interim reevaluation, or a quality control review), information or facts that conflict with previous file data, the Section 8 staff member's knowledge of the family, or is inconsistent with statements made by the family.

3.      Verification or Documentation

A follow-up will be made if the Section 8 Department receives independent verification or documentation that conflicts with representations in the tenant's file (such as public record information or credit bureau reports).

## 10D.   PREVENTION OF SECTION PROGRAM ABUSE AND FRAUD

The management and occupancy staff will utilize various methods and practices (listed below) to prevent program abuse, non-compliance and willful violations of program rules by applicants, assisted families and landlords. The policy objective is to emphasize education as the primary means to obtain compliance by program Participants. The following actions will be taken by HACK staff.

1.      Distribution of "Things YOU Should Know"

This program integrity bulletin (created by HUD's Inspector General) will be furnished and explained to all applicants and Participants to promote understanding of program rules and to clarify HACK's expectations for cooperation and compliance.

2.      Program Briefing Session

Mandatory Briefings will be conducted by Section 8 staff for all applicants, either before or upon issuing a certificate of Family Participation or voucher. At the conclusion of all Briefings, the family representative will be required to sign a "Briefing Certification" to confirm that all rules and pertinent regulations were explained to him/her.

3.      Owner/Landlord Orientation Session

A Section 8 Workshop will be conducted at least annually for Section 8 owners agents in order to assure an understanding of owner, family and Section 8 obligations, and to prevent improper or illegal practices by owners agents.

4.      Participant Counseling

Section 8 Department staff will routinely offer tenant counseling as a part of every re-certification interview in order to clarify any confusion pertaining to program rules and requirements.

5.      Review and Explanation of Certification and other Supplemental Forms

Staff will explain all required forms and review the contents of all re-certification documents prior to signature.

6.      Use of Instructive Signs and Warnings

Instructive signs will be conspicuously posted in common areas and interview areas to reinforce compliance with program rules and to warn about penalties for fraud and abuse.

7.      Landlord and Tenant Certification

All family representatives will be required to sign a 'Tenant Certification" form, and all Owners/Agents will be required to sign a "Landlord Certification" form as contained in HUD's Tenant Integrity Program Manual.

## 10E.   ACTIONS TO DETECT PROGRAM ABUSE AND FRAUD

The Section 8 Department Staff will maintain a high level of awareness to indicators of possible abuse and fraud by assisted families and landlords.

1.      Quality Control File Reviews

Each tenant file will be reviewed before initial certification, and at the completion of all later re-certifications. Such reviews shall include, but are not limited to:

    a.      Changes in reported Social Security Numbers or dates of birth.

    b.      Document authenticity.

    c.      Changes in reported income.

    d.      Family in family composition.

    e.      Review of signatures.

2.      Observation
Section 8 Department staff (including inspectors) will maintain high awareness of circumstances, which may indicate program abuse or fraud; such as when a family's life-style drastically exceeds its reported income or resources.

Public Record Bulletins may be reviewed by Section 8 Department staff to identify information which may indicate program non-compliance.

3.      Owner/Landlord Audits

The Section 8 Department may conduct periodic random quality control audits of Section 8 owners to assure compliance with HAP contracts. Such audits may include, but are not limited to:

    a.    Proof of ownership of assisted housing.

    b.    Rent collection receipts/records, Social Security Number/I.D. Number.

    c.    Maintenance/repair records.

    d.    An inspection of the housing.

4.    State Wage Data Record Keepers

Inquiries to  the State of California, Franchise Tax Board or other  appropriate State agency, under Public Law 100-628, and the Stewart B. McKinley Homeless Assistance Amendments Act of 1988, may be made annually in order to detect unreported wages or unemployment compensation benefits · of program Participants and applicants.

5.    Credit Bureau Inquiries

Credit Bureau inquiries may be made (with proper authorization by the tenant) in the following circumstances:

    a.    When an allegation is received by the Section 8 Department wherein unreported income sources are disclosed.

    b.    When a tenant's expenditures drastically exceed his/her reported income, and no plausible explanation is given.

## 10F.   HANDLING OF ALLEGATIONS OF POSSIBLE ABUSE AND FRAUD

The Section 8 Department staff will encourage program Participants to report suspected abuse to the Section 8 Department. All such referrals, as well as referrals from community members and other agencies, will be thoroughly documented and retained.  Such documentation shall include at least the name, address, telephone number, and relationship to the Participant family of the person, agency, or entity making the referral, if provided by the reporting party.

All allegations, complaints and tips will be carefully evaluated in order to determine if they warrant follow-up. HACK will not follow up on allegations which are vague or otherwise non-specific. HACK will investigate only allegations that contain one or more independently verifiable facts.  HACK staff shall document all efforts to independently verify facts and/or allegations and shall retain such documentation.

3.    File Review.

Housing Choice Voucher Administrative Plan    Revised:  01//2015
Housing Authority of the County of  Kern    Board Approved:  02/11/2015
Chapter 10  Page 4

A file review will be conducted to determine:

a.    If the subject of the allegation is a program Participant.

b.    If the allegation contains information not previously known to the Section 8 Department.

c.    If HACK is the most appropriate authority to do a follow-up (more so than police or social services).

d.    If the Participant's past behavior lends credibility to the allegation.

e.    If there are any other corroborating complaints.

4.    Conclusion of Preliminary Review

If, at the conclusion of the preliminary file review, there are facts contained in the allegation that conflict with the file data and are independently verifiable, HACK may undertake an investigation to determine if the allegation is true or false.

## 10G.   INVESTIGATION OF ALLEGATIONS OF ABUSE AND FRAUD

When HACK has determined that an allegation or referral warrants follow-up, staff or the Investigator designated by the Executive Director to monitor program compliance may conduct the investigation. The steps taken will depend upon the nature of the allegation and may include, but are not limited to, the items listed below. In all cases, the Section 8 Department will secure the written authorization from the program Participant for the release of information.

In the event that HACK initiates proceedings to terminate assistance to the family based in whole or in part on such investigation, the family must be given the opportunity to examine before the hearing any documents that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If HACK does not make the document available for examination on request of the family, HACK may not rely on the document at the hearing.

1.    Credit Bureau Inquiries (CBI)

In cases involving previously unreported income sources, a CBI may be made to determine if there is any financial activity which conflicts with the reported income of the family. In cases where the financial activity conflicts with file data, a Verification of Credit form may be mailed to the creditor in order to determine the unreported income source. Participants shall be provided copies of any documents obtained through such inquiry, if requested.

2.    Employers and Ex-Employers

Housing Choice Voucher Administrative Plan                                 Revised:  01//2015
Housing Authority of the County of  Kern                                Board Approved:  02/11/2015
Chapter 10  Page 5

Employers or ex-employers may be contacted to verify wages which may have been previously undisclosed or misreported.

3.     Neighbors/Witnesses

Neighbors and/or other witnesses who are believed to have direct or indirect knowledge of facts pertaining to HACK's review may be interviewed.

4.     Other Agencies

Investigators, case workers or representatives of other benefit agencies may be contacted.

5.     Public Records

If relevant, HACK may review public records kept in any jurisdictional courthouse. Examples of public records which may be checked are: real estate, marriage, divorce, uniform commercial code financing statements, voter registration, judgments, court or police records, state wage records, postal records and/or any other legally accessible records.

6.     Head of Household or Family Members

HACK may discuss the allegation (or details thereof) with the Head of Household or family member by scheduling an appointment at a HACK Office.  HACK shall attempt to discuss the allegations with the Participant family prior to taking any disciplinary action, including but not limited to termination of assistance.

A high standard of courtesy and professionalism will be maintained by HACK staff who conduct such interviews. Under no circumstances will inflammatory language, accusations, or any unprofessional conduct or language be tolerated by the management or Participant(s). If possible, an additional staff person will attend such interviews.

## 10H.   PLACEMENT OF DOCUMENTS, EVIDENCE AND STATEMENTS OBTAINED BY THE SECTION 8 DEPARTMENT

Documents and other evidence obtained by HACK during the course of an investigation will be considered "work product" and will be kept in a separate "work file." The work file shall be kept in a locked file cabinet. Such cases under review will not be discussed among Section 8 Department staff or with individuals outside the Section 8 Department. Cases will be treated as confidential information. The assigned Investigator will determine "need to know" and "right to know" in discussing cases with other staff.

In the event that HACK initiates proceedings to terminate assistance to the family based in whole or in part on its investigation, the family must be given the opportunity to examine before the hearing any documents that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If HACK does not make the document available for examination on request of the family, HACK may not rely on the document at the hearing.

## 10I.   CONCLUSION OF THE INVESTIGATIVE REVIEW

At the conclusion of the investigative review, the reviewer will report the findings to the Executive Director or designee. The Executive Director or designee then will determine whether a violation has or has not occurred, or if the facts are inconclusive.

Investigation findings will be evaluated to determine the following factors:

1.      The type of violation. (Violations shall be classified as Procedural, non-compliance, or fraud as provided in Section 10J.)

2.      Whether the violation was intentional or unintentional.

3.      What amount of money (if any) is owed to HACK.

4.      If the family is eligible for continued assistance.

## 10J.   ACTIONS AND PROCEDURES FOR CURING DOCUMENTED VIOLATIONS

Once a program violation has been documented in accordance with the process described in Sections 10F-10I above, the violation type will determine the action taken by the Section 8 Department. Violations shall be classified in the following way:

1.   Procedural Non-Compliance

This category applies when the Participant fails to observe a procedure or requirement of the Section 8 Program, but does not misrepresent a material fact, and there is not overpayment of housing assistance.  Some examples of procedural non-compliance are:

a.      Failure to appear at re-scheduled appointment(s). A Participant or applicant who fails to appear for two (2) scheduled appointments and does not contact the office to notify staff of the inability to appear or to reschedule will be deemed in procedural non-compliance.

b.      Failure to return verifications and sign necessary documents in the time period specified by the Section 8 Department.

In cases of procedural non-compliance a Notice to the Family will be sent that contains the following:

a.  A description of the non-compliance and the procedure, policy or obligation which was violated.

b.  The date by which the violation must be corrected, or the procedure complied with.

c.  The action which will be taken by the Section 8 Department if the procedure or obligation is not complied with by the date specified by the Section 8 Department.

d.  The consequences of repeated (similar) violations.

2.  Procedural Non-compliance for Overpaid Housing Assistance

When the Participant owes money to HACK for failure to report changes in income and/or assets, the Section 8 Department will issue a *Notice of Overpayment* that will contain the following:

a.  A description of the violation, including dates and amounts overpaid.

b.  The total amount HACK determines to be owed to HACK.

c.  A ten (10) business day response period in which the Participant may request an informal hearing.

d.  Notification of the right to an informal hearing with instructions for the request of such hearing.

e.  Notification of the Participant's rights in connection with the informal hearing, as provided in Chapter 11.

1.  Participant Fails to Comply with Section 8 Department Notice

If the Participant fails to comply with the Section 8 Department Notice, and a family obligation has been violated, the Section 8 Department will terminate assistance in the manner prescribed by HUD.

2.  Participant Complies with Section 8 Department Notice

When a Participant complies with the Section 8 Department Notice, the staff person responsible will meet with him/her to discuss and explain the obligation or procedure that was violated, and the consequences of future violations. The staff person will then complete a Participant Counseling Report, give one (1) copy to the family and retain a copy in the participant file.

3. Intentional Misrepresentations

When a participant falsifies, misstates, omits or otherwise misrepresents a material fact that results (or would have resulted) in an overpayment of housing assistance, HACK must establish:

a.    The participant had knowledge that his/her actions were not in compliance with Program requirements or policies. This can be demonstrated by showing that the Participant was made aware of program requirements and prohibitions. The Participant's signature on various certifications, briefing certificates, Personal Declaration and *Things You Should Know* show the Participants knowledge of Program requirements or policies.

b.    The Participant willfully violated the law.

    Any of the following circumstances is adequate to demonstrate willful intent:

    (1)    An admission by the Participant of misrepresentation.

    (2)    The act was done repeatedly.

    (3)    A false name or Social Security Number was used.

    (4)    There were admissions to others of the illegal action or
    (5)     omission.

    (6)    The Participant omitted material facts that were known to
    (7)     him/her (e.g., employment of self or other household
    (8)    member).

    (9)    The Participant falsified, forged or altered documents.

## 10K.    Participant CONFERENCES

When the investigation has established that material misrepresentation(s) have occurred, a Participant Conference will be scheduled with the family representative and HACK staff who are the most knowledgeable about the circumstances of the case. This Conference will take place before any proposed action by the Section 8 Department unless Participant fails to cooperate and a Conference cannot take place or take place in a timely manner.

HACK shall notify the Participant in writing of the time and place of the Participant conference at least five (5) business days prior to the conference.  Such notice shall also advise the Participant:

    1.  That the purpose of the conference is to review information obtained by HACK through

Housing Choice Voucher Administrative Plan        Revised:  01//2015
Housing Authority of the County of  Kern        Board Approved:  02/11/2015
Chapter 10  Page 9

its investigation and give the Participant an opportunity to explain any conflicts in the information obtained by HACK;

2. That HACK will determine the appropriate response to the material misrepresentation based in part upon the Conference;

3. That the Participant may present documents or other evidence in support of the Participant's position;

4. That, if English is not the Participant's primary language, the Participant may request an interpreter, which will be provided at HACK's expense in accordance with HACK's LEP; and

5. That the Participant may contact HACK to reschedule the conference if necessary

6. The Participant will be given seven (7) calendar days following the conference to furnish any mitigating circumstances

A secondary purpose of the Participant Conference is to assist the Section 8 Department in determining the course of action most appropriate for the case.  Before the final determination of the proposed action, the following shall be considered:

1. The duration of the violation and number of false statements.

2. The tenant's ability to understand the rules.

3. The tenant's willingness to cooperate, and to accept responsibility for his/her actions.

4. The amount of money involved (see Section 10L below for guidelines).

5.  The tenant's past history.

6. Whether or not the Participant willfully violated the law
   If HACK believes that the Participant may be incapable of understanding the program rules due to a disabling mental, physical, or emotional condition, HACK shall provide the Participant with the opportunity to engage in an interactive process with the Participant, in good faith, to attempt to reasonably accommodate such disabling condition to allow the Participant to continue receiving assistance.

## 10L. DISPOSITIONS OF CASES INVOLVING MISREPRESENTATIONS

In all cases of misrepresentations involving efforts to recover monies owed, the Investigations Division and Housing Management Director may elect, depending upon their evaluation of the

criteria stated in Section 10K above, one or more of the actions listed in this section.

Before HACK takes any action involving termination or surrender of the Participant's rental assistance, the Participant is entitled to an informal hearing under the procedures described in Chapter 11.

If the investigation has established willful intent as defined in Section 10J(3)(b) above, and the case meets the criteria for prosecution, staff may present the case to the Executive Director with a recommendation to:

1.  Criminal Prosecution

    a.  Refer the case to the local State or District Attorney, notify HUD's Regional Inspector General Investigator (RIGI), and terminate rental assistance;

    b.  Refer the case to HUD's RIGI, and terminate rental assistance.

2.  Administrative Remedies,

HACK staff may elect to:

    a.  Terminate assistance and demand payment of restitution in full.

    b.  Terminate assistance and execute an administrative repayment agreement per HACK's repayment policy.

    c.  Terminate assistance and pursue restitution in full.

    d.  Continue assistance at the correct rent and demand repayment of restitution in full.

    e.  Continue assistance at the correct rent and execute an administrative repayment agreement per HACK's repayment policy.

HACK adopts the following thresholds for the disposition of cases resulting in a monetary loss:

    **A.  $1 to $499:**

        (1)  No criminal charges filed.

        (2)  Required restitution from tenant.

        (3)  Allow tenant to remain in the housing assistance program provided:

            (a)  Tenant agrees to make restitution

(b)     Tenant agrees to report all income and any changes in family composition with the understanding that any further violations of these two (2) lease sections will result in termination from the housing assistance program involved.

**B.  $500 to $999:**

1.     Criminal charges under Section 487.1 (Theft by False Pretense) of the California Penal Code may be filed. All charges will be filed under Section 17 (Misdemeanor) of the Penal Code of the State of California.

2.     Tenant will be required to pay full restitution within a year (12 months) or less depending on the amount involved.

3.     Tenant may be allowed to remain in the housing assistance program provided:

   a.     Tenant signs a restitution agreement and pays the amount owed within one (1) year.

   b.     Tenant pays on a monthly basis and misses no payments unless the Housing Authority grants an extension on the payment schedule.

   c.     Tenant agrees to refrain from further fraud-related violations of the Lease Agreement. Any further fraud violations will result in termination from the housing program.

   d.     Tenant agrees to give up his/her right to any hearing on any subsequent fraud violation.

   e.     Any monies owed will become payable in full immediately if tenant is found to have committed fraud again.

**C.  $1,000 to $1,999**

1.     Criminal charges under Section 487.1 of the California Penal Code can be filed against the tenant provided they are filed under Section 17 (charges filed as a misdemeanor).

2.     Criminal charges can be tabled if tenant agrees to:

   a.     Make restitution in full by paying full amount owed immediately or signing a restitution agreement in which tenant agrees to pay full amount within one (1) year.

   b.     Surrender Section 8 certificate or voucher for cause and without a hearing

or surrender possession and the housing occupied by the tenant regardless of what housing program is involved.

    c.    Not re-apply to Section 8 program for a period of one (1) year.

**D.  $2, 000 to $4,999**

1.    Criminal charges will be filed against tenant for violation of Section 487.1 of the California Penal Code.

2.    Charges can be filed as Felony or Misdemeanor at the discretion of the District Attorney.

3.    Tenant will be prosecuted and upon a conviction or guilty plea, restitution in full will be requested through the Probation Department. Amount of monthly payment will be determined by Probation.

4.    Tenant will be terminated from Section 8 assistance program for cause.

**E.  $5,000 and above**

1.    All criminal charges will be filed and prosecuted as FELONIES in the appropriate court.  The District Attorney will determine method of prosecution and charges to be filed.

2.    Felony Probation and full restitution will be requested. Method and amount of payment to be determined by the Probation Department.

3.    Tenant will be terminated from housing program for cause.

## 10M. NOTIFICATION TO TENANT OF PROPOSED ACTION

The Section 8 Department will notify the tenant of the proposed action no later than ten (10) days after the tenant conference by certified mail. Such notice will contain:

1.  The action being proposed by HACK.

2.  The reason for the proposed action.

3.  The date the proposed action will take place.

4.  The tenants right to further explanation, if needed.

5.  The tenant's right to an informal hearing and the form and date by which request for such hearing must be received.

Housing Choice Voucher Administrative Plan                                           Revised:  01//2015
Housing Authority of the County of  Kern                                     Board Approved:  02/11/2015
Chapter 10  Page 13

6.  A copy of the Section 8 Program Informal Hearing Procedures.

## 10N. AUTOMATIC HAP CONTRACT TERMINATIONS

There are several instances where a HAP contract will automatically terminate. Such automatic termination will occur when:

1.  The assisted family vacates its housing in violation of the Lease and any applicable vacancy period for which the owner may be eligible for compensation has ended;

2.  The family has moved from their housing according to the Lease terms, or secured owner permission for an early termination date, and the Lease term has, therefore, ended;

3.  The owner has required the family to move per the Lease terms, and the Lease term has, therefore, ended (e.g.; 30-day notice, refusal to renew, eviction);

4.  The owner has evicted the family and any applicable vacancy period for which the owner may be eligible for compensation has ended (see Chapter 12);

5.  The owner does not wish to enter into a new HAP contract.

## 10(O)   HACK-INITIATED HAP CONTRACT TERMINATIONS

HACK may find it necessary to terminate the HAP contract prior to its regular termination date under the following circumstances:

1.  The housing has been found to be in non-compliance with the HQS or their Contract requirements, the owner has refused to correct the deficiencies, and HACK has decided to terminate the HAP contract;

2.  Due to changes in family composition, HACK has determined the housing to be either overcrowded or under-occupied, requiring the family to transfer to other housing. To terminate the HAP contract in such instances, the following must occur:

    a.  HACK must have issued a new voucher to the family, permitting them to obtain housing elsewhere; and

    b.  The voucher has expired after the family has:

        1.  rejected, without good cause, suitable housing which HACK has found to be available to the family, or

        2.  the family has failed to make a good faith effort to find new housing.

3.  The assisted family has been determined ineligible for assistance at the time of reexamination, has been paying the full Contract Rent for a year, and either the owner has

terminated the Contract prior to or on the anniversary date of the original Contract.

4.  A family who has been determined provisionally eligible for a transfer to new housing with assistance has failed to satisfy any liability for damage that HACK may have required to be satisfied by a specific date.

5.  HACK is unable to approve a new Request Tenancy of Approval and is not, therefore, entering into a new HAP contract.

6.  HACK has determined that the owner is not in compliance with the terms of the HAP contract.

7.  HACK has determined that the family is not in compliance with the terms of its certificate or voucher.

8.  A family has been determined to have abused the program or engaged in fraudulent activities.

9.  HACK has determined that an owner has abused the program or engaged in fraudulent activities.

10. The family is responsible for HQS violations caused by the family:

    a.  By failing to pay for tenant-supplied utilities.

    b.  By failing to supply appliances that the owner is not required to supply under the lease.

    c.  By damaging the housing (other than damage from ordinary wear and tear).

11. The family is responsible for vermin and rodent infestation caused by trash accumulation from poor family housekeeping. An owner may evict if family housekeeping creates a serious or repeated violation of the lease. HACK may terminate assistance for such violation of the lease.

12. If HACK determines that funding under Consolidated Annual Contribution Contract (CACC) is insufficient to support continued assistance for families in the program.

    A. Elderly (62 years and older) and disabled families (a family whose head, spouse, or sole member is a person with disabilities) will be exempt from terminations due to insufficient funds.

    B. Special Purpose Housing Choice Vouchers for Non Elderly Disabled (NED), HUD's Veterans Affairs Supportive Housing (HUD-VASH) or Family Unification Program (FUP) families must be the last terminated.

    C. Families will be terminated based on the following criteria in order of priority:

1. Participant families receiving subsidy for more than 7 years; in descending order based on length of time

    a. For example: (Based on 4/13/2011)
       *Participant A -Leased up on 3/1/2003*
       *Participant B -Leased up on 2/1/2004*
       *Participant C -Also Leased up on 2/1/2004*
       *Participant D -Leased up on 9/1/2004*

       In order of priority, *Participant A* would be the first to be terminated as they have been in the program more than 7 years. *Participant B* would follow as they have been in the program 7 years as of February 1st. *Participant C*, who is elderly, would not be given a notice since he is exempt. *Participant D* would also not be given a notice since he has not yet been on the program for 7 years.

2. Families receiving less than $100 in subsidy payments for rental of their unit.

    a. In order of priority for this group, Participants paying the lesser portion of rent would be the first to be terminated (i.e. ·a family paying $50.00 monthly would be terminated before a family whose portion is $79.00).

3. Families paying full contract rent.

D.  Families will be reinstated  immediately when it is determined  funds are available

    1. Reinstated families must be otherwise eligible for the program pursuant to Chapter I.
    2. HACK will send notice to families at the last known address.
    3. Families must notify HACK of any address change within 10 days.
    4. Families must respond to notification within 30 days.

E.  No new vouchers will be issued before families have been re-instated.

## 10P.  EVICTIONS

Sections 882.215 and 882.514 of Title 24 of the Code of Federal Regulations requires that specific actions be taken by an owner in order to evict an assisted family, and also requires that HACK be given notice as soon as the family is notified.

In order to evict an assisted family, the owner must:

1.  Comply with the all applicable requirements of Federal, State and local law;

2.  Provide a copy of the notice to HACK.

## 10Q.   FAMILY ELIGIBILITY FOR CONTINUED ASSISTANCE

A family is eligible for continued assistance to transfer to a new location as long as the family:

1.  Is not liable to HACK for unpaid rent or damages paid on their behalf or was liable but has satisfied such liability; and

2.  Is otherwise eligible per the eligibility criteria established in this Plan;

3.  If the family is determined to be ineligible for continued assistance at the time of termination of tenancy, HACK will inform the family of its right to request, within ten (10) business days, an informal hearing (Refer to Chapter 11 for additional notice and hearing requirements).  Until the decision becomes final as described in the paragraph below, HACK will afford the family limited transfer rights pursuant to 24 CFR 982.314. The family can initiate the transfer process up to but not including leasing a new unit.

Assistance may be terminated if a final decision has determined the family has abused the program, violated family obligations, engaged in fraudulent activities or if the family has failed to comply with the terms of an agreement to HACK for amounts paid to an owner for unpaid rent or damages. Final determination means the tenant has received notice regarding the alleged issue and the decision is final because the tenant didn't appeal, or because the tenant appealed but the hearing officer did not decide in the tenant's favor.

A landlord's issuance of a notice or initiation of eviction proceedings will not serve as the sole basis for denying a family full transfer rights. If the landlord initiates eviction proceedings against the family, and HACK has not proposed termination of assistance, the family may move and use their assistance at a new location.

## 10R.   DENIAL OR TERMINATION

This section states the grounds on which HACK may deny assistance for an applicant or terminate assistance for a Participant under the programs because of the family's action or failure to act. The provisions of this section do not affect denial or termination of assistance for grounds other than action or failure to act by the family.

1.  Denial of assistance for an applicant may include any or all of the following:

    a.  denying listing on the HACK waiting list,

    b.  denying or withdrawing the voucher,

    c.  refusing to enter into a HAP contract or approve a lease, and

    d.  refusing to process or provide assistance under portability procedures.

2.  Termination of assistance for a Participant may include any or all of the following:

    a.  refusing to enter into a HAP contract or approve a lease,

    b.  terminating HAP under outstanding HAP contract, and

    c.  refusing to process or provide assistance under portability procedures.

This section does not limit or affect exercise of HACK rights and remedies against the owner under the HAP contract, including termination, suspension or reduction of HAP, or termination of the HAP contract.

3.  HACK may at any time deny program assistance for an applicant, or terminate program assistance for a Participant, for any of the following grounds:

    a.  The family violates any family obligations under the program (refer to 24 C.F.R. Section 982.551).

    b.  Any member of the family has been evicted from federally assisted housing in the past five years.

    c.  Any HA has ever terminated assistance under the certificate or voucher programs for any member of the family.

    d.  Any member of the family commits drug-related criminal activity, abuse or pattern of abuse of alcohol that may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents, or violent criminal activity (refer to 24 CFR Section 982.553)

    e.  Any member of the family commits fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program.

    f.  The family currently owes rent or other amounts to the HA or to another HA in connection with Section 8 or public housing assistance under the 1937 Act.

    g.  The family has not reimbursed any HA for amounts paid to an owner under a HAP contract for rent, damages to the housing, or other amounts owed by the family under the lease.

    h.  The family breaches an agreement with the HA to pay amounts owed to an HA, or amounts paid to an owner by an HA. (The HA, at its discretion, may offer a family the opportunity to enter an agreement to pay amounts owed to an HA or amounts paid to an owner by an HA. The HA may prescribe the terms of the agreement.)

Housing Choice Voucher Administrative Plan    Revised: 01//2015
Housing Authority of the County of Kern    Board Approved: 02/11/2015
Chapter 10  Page 18

i. The family participating in the FSS program fails to comply, without good cause, with the family's FSS participation contract.

j. The family has engaged in or threatened abuse or violent behavior toward HA personnel.

4.   HACK Discretion to Consider Circumstances

In deciding whether to deny or terminate assistance because of action or failure to act by members of the family, HACK has discretion to consider all of the circumstances in each case, including the seriousness of the case, the extent of participation or culpability of individual family members, whether a reasonable accommodation is needed for a Participant's disability which would eliminate the basis of the termination, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure.

HACK may impose, as a condition of continued assistance for other family members, a requirement that family members who participated in, or were culpable for, the action or failure will not reside in the housing. HACK may permit the other members of a Participant family to continue receiving assistance.

5.   Requirement to Sign Consent Forms

HACK must deny or terminate assistance if any member of the family fails to sign and submit required consent forms for obtaining information.

6.   Restriction on Assistance to Non-citizens

For provisions on assistance for mixed families (families whose members include those with eligible immigration status, and those without eligible immigration status) instead of The families submit required evidence of citizenship or eligible immigration status. See 24 CFR Section 5.514 for a statement of circumstances in which HACK must deny or terminate assistance because a family member does not establish citizenship or eligible immigration status, and the applicable informal hearing procedures.  Assistance to a family may not be delayed, denied, reduced or terminated because of the immigration status of a family member except as provided under Section 5.514. See 24 CFR Section 5.516 denial or termination of assistance and for provisions on deferral of termination of assistance.

7.   Information for Family

HACK must give the family a written description of:

a.   Family obligation under the program.

b. The grounds on which HACK may deny or terminate assistance because of family action or failure to act.

c. HACK informal hearing procedures, including the family's right to be represented by counsel or other representative, the right to review HACK's documents related to the informal hearing (and have excluded from the hearing any requested documents that were not provided to the Participant prior to hearing), the right to present evidence and testimony in support of the Participant's position at the hearing, and the right to confront and cross-examine witnesses.  (Refer to Chapter 11 for additional information regarding the informal hearing process.)

HACK must include such information with any termination notice given to the family (see Chapter 11).

## 108.   CRIME BY FAMILY MEMBERS

HACK may deny assistance to an applicant, or terminate assistance to a Participant family at any time if any member of the family is involved in:

1.   Drug-related criminal activity;

2.   Violent criminal activity; or

3.   A pattern of abuse of alcohol or other controlled substances that may adversely affect the health, safety or welfare of others.

If HACK seeks to deny or terminate assistance because of illegal use, or possession for personal use, of a controlled substance, such use or possession must have occurred within one (1) year before the date that HACK provides notice to the family of its determination to deny or terminate assistance. HACK may not deny or terminate assistance for such use or possession by a family member if the family member can demonstrate that he or she:

1. Has an addiction to a controlled substance, has a record of such an impairment, or is regarded as having such an impairment; and

2. Is recovering, or has recovered from, such addiction and does not currently use or possess controlled substances. HACK may require a family member who has engaged in the illegal use of drugs to submit evidence of participation in, or successful completion of, a treatment program as a condition to being allowed to reside in the housing.

Evidence of criminal activity: In determining whether to deny or terminate assistance based on drug-related criminal activity or violent criminal activity, HACK may deny or terminate assistance if the preponderance of evidence indicates that a family member has engaged in such activity, regardless of whether the family member has been arrested or convicted.

## 10T.   VACANCY LOSS

If a family moves out, the owner may keep the HAP for the month when the family moves out, HACK may not make any further payments. [See 24 CFR 982.311(d)(l)].

## 10U.   SECURITY DEPOSIT DISPOSITION

If a family vacates its housing, the owner, subject to State and local law, may use the security deposit as reimbursement for any unpaid family contributions or other amounts owed under the Lease (damages). If no such amounts are owed, or if the amounts owed are less than the amount of the Security Deposit, the owner must refund the full amount or the unused balance to the family, including any interest required to be paid on such deposits by State and local law.

## 10V.   OWNER CLAIMS FOR DAMAGES, UNPAID RENT, AND VACANCY

### LOSS AND PARTICIPANT'S ENSUING RESPONSIBILITIES

This Section only applies to HAP contracts in effect before OCTOBER 2, 1995. Certificates have a provision for damages, unpaid rent, and vacancy loss. Vouchers have a provision for damages and unpaid rent. No vacancy loss is paid on vouchers. No Damage Claims will be processed unless HACK has performed a move-out inspection. Either the tenant or the owner can request the move-out inspection. Ultimately, it is the owner's responsibility to request the move-out inspection if he/she believes there may be a claim.

Damage claims are limited in the following manner:

In the Certificate Program, owners are allowed to claim up to two (2) months contract rent minus greater of the security deposit collected or the security deposit that should have been collected under the lease.

In the Voucher Program, owners are allowed to claim up to one (1) month contract rent minus greater of the security deposit collected or the security deposit that should have been collected under the lease. There will be no payment for vacancy losses under the Voucher Program.

No damage claims will be paid under either program effective on or after October 2, 1995.

## 10W.   OWNER CLAIMS FOR PRE-OCTOBER 2, 1995 UNITS

In accordance with the HAP contract, owners can make special claims for damages, unpaid rent, and vacancy loss (vacancy loss cannot be claimed for vouchers) after the tenant has vacated or a proper eviction proceeding has been conducted.

Owner claims for damages, unpaid rent, and vacancy loss are reviewed for accuracy and completeness. Claims are then compared to the move-in and move-out inspections to determine if an actual claim is warranted. No claim will be paid for normal "wear and tear". Unpaid utility bills are not an eligible claim item.

HACK will make payments to owners for approved claims. It should be noted that the tenant is ultimately responsible for any damages, unpaid rent, and vacancy loss paid to the owner and will be held responsible to repay HACK to remain eligible for the Section 8 Program.

Actual bills and receipts for repairs, materials, and labor must support claims for damages. HACK will develop a list of reasonable costs and charges for items routinely included on damage claims. This list will be used as a guide.

Owners can claim unpaid rent owed by the tenant up to the date of HAP termination.

In the Certificate Program, owners can claim for a vacancy loss as outlined in the HAP contract. In order to claim a vacancy loss, the owner must notify HACK immediately upon learning of the vacancy or suspected vacancy. The owner must make a good faith effort to rent the unit as quickly as possible to another renter.

All claims and supporting documentation under this Section must be submitted to HACK within thirty (30) days of the move-out inspection. Any reimbursement shall be applied first towards any unpaid rent. No reimbursement may be claimed for unpaid rent for the period after the family vacates.

## 10X.   PARTICIPANT RESPONSIBILITIES

If a damage claim or unpaid rent claim has been paid to an owner, the Participant is responsible for repaying the amount to HACK. This shall be done by either paying the full amount due immediately upon HACK's requesting it or through a Repayment Agreement that is approved by HACK.

## 10Y.   LANGUAGE ACCESS

All notices referred to in this chapter shall be considered vital documents and shall be translated into the Participant family's primary language, if other than English, in accordance with HACK's Limited English Proficiency Plan ("LEP").

# Chapter 11 – Administrative Plan

# CHAPTER 11

## INFORMAL REVIEWS AND INFORMAL HEARINGS

*Cross Reference: (reserved)

## 11A.    INFORMAL REVIEW

### 1.    Reasons

An applicant shall have the right to an Informal Review for the following reasons:

a.    The applicant has been denied placement on the waiting list.

b.    HACK has refused to issue a Voucher of Family Participation.

c.    HACK has refused to allow the applicant to participate in the program

### 2.    Notification of Applicant

If HACK has taken any of the aforementioned actions, it must notify the applicant, in writing, of the reasons for the action and the right of the applicant to request, within ten (10) business days from the date of issuance of the notice, an Informal Review. After conducting the Review, HACK will promptly notify the applicant, in writing, of its final decision.

### 3.    Review Procedure

a.    The applicant must notify HACK, in writing, of his/her desire for an Informal Review.  The request must be made within ten (10) business days from the issuance of the notice of the right to request an Informal Review.

b.    The request from the applicant may state the reasons he/she object to the Determination.

c.    The applicant may be represented by an attorney or other representative, at his/her own expense.

d.    At the Review, the applicant, or his/her representative, may present oral or written objections to HACK's determination.

e.    The review will be conducted by any person designated by HACK, other than the person who made or approved the decision under review or a subordinate

of that person.

f.      HACK shall not grant a review requested by an applicant if the request is for any of the following reasons:

1.      To review discretionary administrative determinations by HACK, or to consider general policy issues or class grievances;

2.      To review HACK's determination of the number of bedrooms entered on the certificate under the standards established by HACK (see Chapter 3).

3.      To review HACK's determination that housing does not comply with the HQS, or HACK's determination not to approve the lease for the housing.

4.      To review HACK's decision not to approve a request by a certificate holder for an extension or suspension of the term of the certificate or voucher.

5.      A HACK determination not to grant approval to lease housing under the program or to approve a proposed lease.

6.      A HACK determination that housing selected by the applicant is not in compliance with HQS.

7.      A HACK determination that housing does not meet HQS because of family size or composition.

## 11B.   INFORMAL HEARINGS

1.      Participant's Right to Informal Hearing

A participant shall have the right to an Informal Hearing to consider whether decisions relating to individual circumstances of the family fall within the law, HUD regulations and HACK policy, in the following cases:

a.      A determination of the family's annual or adjusted income, and the use of such income to compute the HAP.

b.      A determination of the appropriate utility allowance (if any) for tenant-paid utilities from the HACK utility allowance schedule.

c.      A determination of the family housing size under the HACK subsidy standards.

     d.     A determination that a voucher program family is residing in housing with a larger number of bedrooms than appropriate for the family housing size under HACK subsidy standards, or the HACK determination to deny the family's request for an exception from the standards, including a request for a hardship exemption from the minimum rent.

     e.     A determination to terminate assistance for a participant family because of the family's action or failure to act. (See 24 CPR 982.552)

     f.     A determination to terminate assistance because the participant family has been absent from the assisted housing for longer than the maximum period permitted under HACK policy and HUD rules.

2.     In cases described in paragraphs (1) (a), (d), (e), and (f) of this chapter, HACK must give the opportunity for an Informal Hearing before HACK terminates HAP for the family under an outstanding HAP contract.

3.     HACK may extend the period of time for requesting a hearing (for a specified period) at its discretion, and may extend the period of time for a specified period upon good cause shown or if HACK at any time determines that good cause exists. Good cause includes, but is not limited to, documented medical emergencies, natural disasters, and lack of actual notice to the participant caused by HACK's action or failure to act. HACK may also extend the period of time for requesting a hearing if such extension is needed to reasonably accommodate a family member's disability.

4.     When a Hearing is not Required

     HACK is not required to provide a participant family an opportunity for an Informal Hearing for any of the following:

     a.     Discretionary administrative determinations by HACK.

     b.     General policy issues or class grievances.

     c.     Establishment of the HACK schedule of utility allowances for families in the program.

     d.     A HACK determination not to approve an extension or suspension of a voucher term.

Housing Choice Voucher Administrative Plan     Revised: 01/2015
Housing Authority of the County of Kern     Board Approved: 02/11/2015
Chapter 11 Page 3

e.  A HACK determination not to approve housing or a lease.

f.  A HACK determination that assisted housing is not in compliance with HQS. However, HACK must provide the opportunity for an Informal Hearing for a decision to terminate assistance for a breach of HQS caused by the family as described in 24 CFR 982.551(c).

g.  A determination by HACK to exercise or not to exercise any right or remedy against the owner under a HAP contract.            '

h.  HACKs determination that the unit is not in accordance with HQS because of the family size.

5.  Notice to Family

In the cases described in paragraphs 11B.(1)(a), (b), and (c) of this chapter, HACK must notify the family in writing that they may ask for an explanation for the basis of HACK's determination, and that if the family does not agree with the determination, they may request an Informal Hearing on the Decision.

In the cases described in paragraphs 11B.(1)(d), (e), and (f) of this chapter, HACK must give the family prompt written notice that the family may request a hearing.

The notice must:

a.  Contain a brief statement of the action being proposed by HACK, the effective date of the proposed action, and the reasons for the proposed action.
b.  State that if the family does not agree with the decision, the family may request an Informal Hearing on the decision.

c.  State the deadline for the family to request an Informal Hearing, which shall be no less than ten (10) business days from the date of issuance of such notice.

d.  Notify the family of its rights in connection with the informal hearing, including the right to be represented by counsel or other designated representative, the right to review HACK's documents related to the informal hearing (and to have excluded from the hearing any requested documents that were not provided to the participant prior to hearing), the right to present evidence and testimony in support of the participant's position at the hearing, and the right to confront and cross examine witnesses.

e.  Include a copy of the Section 8 Program Informal Hearing Procedures.

6.  Expeditious Hearing Process

Where a hearing for a participant family is required under this section, HACK must

proceed with the hearing in a reasonably expeditious manner upon request of the family. Unless a sooner hearing date is requested by the family, HACK shall set a hearing date no sooner than fourteen (14) days after it receives the family's hearing request.  HACK shall mail notice of the hearing to the family or the family's representative at least 10 days before the hearing date.

A family may request a continuance of the hearing date upon five days notice. HACK may at its discretion grant requests for continuance where the family states reasonable grounds including illness, other outside emergencies, or need to obtain counsel.

7.    Hearing Procedures

The Administrative Plan must state HACK procedures for conducting Informal Hearings for participants.

a.    Discovery By Family

The family must be given the opportunity to examine the participant file and any documents, before the hearing that are relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If HACK does not make the document available for examination and copying on request of the family, HACK may not rely on the document at the hearing.

b.    Discovery By HACK

HACK hearing procedures may provide that HACK must be given the opportunity to examine any and all family documents before the hearing that are directly relevant to the hearing. HACK must be allowed to copy any such document at HACK's expense. HACK must notify the family that, if the family does not make the document available for examination on request of HACK, the family may not rely on the document at the hearing.

c.    Documents

The term "documents" includes records and regulations.

d.    Representation of Family

The family may be represented by a lawyer or other representative at its own expense.  Such representative may make statements on the family's behalf at the hearing.  If the family indicates that it is represented by a lawyer or other representative, HACK shall communicate with the family's representative regarding all matters related to the hearing.

8.      Hearing Officer: Appointment and Authority

    a.      The hearing may be conducted by a hearing officer designated by HACK. The person conducting the hearing shall be knowledgeable regarding HUD regulations, state landlord-tenant law, anti-discrimination law and basic constitutional law principles.  Current or former HACK employees will not conduct hearings involving proposed terminations.

    b.      The person who conducts the hearing may regulate the conduct of the hearing per HACK hearing procedures and Federal regulations.

9.      Evidence

HACK and the family must be given the opportunity to present evidence, and may question any witnesses. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.  HACK will give statements of persons who are not present at the hearing appropriate weight, considering legally established indicia of reliability, including but not limited to the person's potential bias and whether the statement is consistent on its face. HACK shall not base termination of a family's assistance solely on statements by persons who are not present at the hearing.

HACK has the burden of proof to establish a basis for termination by a preponderance of the evidence.  As such, HACK should present its evidence first.  The family has the burden to establish any defenses or the existence of any mitigating circumstances by a preponderance of the evidence.

10.      Issuance of Decision

The person who conducts the hearing must issue a written decision that briefly states the reasons for the decision.  Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing.  The written decision should include all of the following:

    a.      A summary of the factual and legal grounds for HACK's action;

    b.      A summary of the evidence offered in support of HACK's course of action;

    c.      A summary of the evidence offered by the family in defense and/or mitigation, if any;

    d.      An evaluation of the evidence;

    e.      An indication of the legal rules determined to be applicable by the hearing officer;

f.      Application of the law to the facts; and

g.      A statement of the hearing officer's ultimate conclusion to uphold or reverse HACK's course of action.

The decision shall notify the family of the availability of judicial review and the timeline for seeking review.  A copy of the hearing shall be furnished promptly to the family in writing, and to the family's designated representative, if any.

11.    Notice to Family of Hearing Procedures

HACK shall provide a copy to participant families of the above hearing procedures at initial lease sign up and upon the family's request for an informal hearing.

12.    HACK Not Bound by Decision

HACK is not bound by a hearing decision that concerns a matter for which HACK is not required to provide an opportunity for an Informal Hearing under this chapter, or that otherwise exceeds the authority of the person conducting the hearing under HACK hearing procedures.

HACK is not bound by a hearing decision that is contrary to HUD regulations or requirements, or otherwise contrary to Federal, State, or local law.

If HACK determines that it is not bound by a hearing decision, HACK must promptly notify the family of the determination, and of the reasons for the determination.

13.    Restrictions on Assistance for Non-Citizens

The Informal Hearing provisions for the denial of assistance on the basis of ineligible immigration status are contained in 24 CFR 812.9.

14.    After notification of the results of an INS appeal, or in lieu of request of appeal to the INS, a family may request that HACK provide a hearing regarding ineligible immigration status. This request must be made either within fourteen (14) days of the date HACK mails or delivers the notice in accordance with Chapter 2, or within fourteen (14) days of the mailing of the INS appeal decision.

15.    The procedures for an Informal Hearing for participants concerning ineligible immigration status are set forth in Paragraphs 7-12.

16.    The procedures for an Informal Hearing before the HA concerning ineligible immigration status for applicants are:
    a.      The applicant shall be provided a hearing before person designated by HACK

(other than a current or former officer or employee of HACK if the hearing is regarding a proposed termination), other than the person who made or approved the decision under review, and other than a subordinate of the person who made or approved the decision. The hearing officer shall be knowledgeable regarding HUD regulations, state landlord-tenant law, anti-discrimination law and basic due process principles.

b.      The applicant shall be provided the opportunity to examine and copy, at the applicant's expense and at a reasonable time in advance of the hearing, any documents in the possession of HACK pertaining to the applicant's eligibility status, or in the possession of the INS (as permitted by INS requirements), including any records and regulations that may be relevant to the hearing. When HACK notifies the applicant of the hearing, HACK shall notify the applicant in writing of the applicant's right to be given the opportunity to examine before the hearing any documents that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If HACK does not make the document available for examination on request of the family, HACK may not rely on the document at the hearing.

c.      HACK shall notify the applicant that the applicant is entitled to an interpreter pursuant to HACK's LEP Plan if needed to allow the applicant to fully and fairly participate in the hearing.

d.      The applicant shall be provided the opportunity to present evidence and arguments in support of eligible immigration status. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

e.      The applicant shall be provided the opportunity to dispute evidence relied upon by the HA and to confront and cross-examine all witnesses on whose testimony or information the HA relied upon;

f.      The applicant shall be entitled to be represented by an attorney, or other designee, at the applicant's expense, and to have such person make statements on the applicant's behalf;

g.      The applicant and HACK shall be entitled to have the hearing recorded by audiotape and HACK shall provide a copy of the audio recording to the applicant, upon the applicant's request and at the applicant's cost; and

h.      HACK shall provide the family with a written final decision based solely on the evidence presented at the hearing, within fourteen (14) days of the date of the conclusion of the Informal Hearing. The decision shall state the basis for the

decision and shall include findings sufficient to allow a reviewing court to examine HACK's factual and legal reasons for the decision.

17.    Judicial Relief

A decision against a family member under the INS appeal process or the Informal Hearing, does not preclude the family from exercising the right, that may otherwise be available, to seek redress directly through judicial process. Where judicial review is available, HACK shall promptly notify the family of the availability of judicial review and the timeline for seeking such review.

18.    Appeal to INS

Upon receipt of notification that the INS secondary verification failed to confirm eligible immigration status, HACK shall notify the family of the results of the INS verification, and the family shall have thirty (30) days from the date of the notification to request an appeal of the INS results. The request for appeal shall be made by the family in writing directly to the INS. The family must provide the HA with a copy of the written request for appeal and proof of the mailing. HACK shall grant the family an extension of the time within which to request an appeal if the family can show good reasons for its delay.

The INS will issue the results of the appeal to the family, with a copy to HACK, within thirty
(30) days of its receipt.   The INS will inform the family and HACK of delays, if necessary.

When HACK receives a copy of the INS response, HACK shall notify the family of its right to request an Informal Hearing on the ineligibility determination.

19.    Response to INS Ineligibility

    a.    The participant must notify HACK, in writing, of his/her desire for an Informal Hearing.  The request must be made within ten (10) business days of the Participant's receipt of the notice.

    b.    The request from the Participant must state the reasons he/she objects to the determination.

    c.    The Participant may be represented by an attorney or other representative, at his/her own expense.

    d.    The Hearing will be conducted by a person(s) designated by HACK, other than the

person who made or approved the decision under review or a subordinate of the person.

e.     The Hearing Officer shall have the sole right to regulate the order and conduct of the hearing.

f.     HACK and the Participant will be given the opportunity to present evidence and may question any witnesses. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

g.     The Hearing Officer will issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the Participant will be based on the evidence presented at the hearing. A copy of the hearing decision shall promptly be furnished to the Participant.

20.    HACK Not Bound by Decision

HACK is not bound by a hearing decision if:

e.     The Hearing concerned a matter for which HACK is not required to provide the opportunity for a hearing.

f.     The decision of the Hearing Officer is contrary to HUD regulations or requirements, or otherwise contrary to Federal, State, or local laws.

If HACK determines that it is not bound by a hearing decision, HACK will promptly notify the Participant of the determination.


## 11C. CONSIDERATIONS

In determining whether to deny or terminate assistance based on drug-related criminal activity or violent criminal activity HACK will consider the preponderance of evidence that indicates that a family member has engaged in such activity, regardless of whether the family member has been arrested or convicted.

HACK shall have discretion to consider all of the circumstances in each case, including the seriousness of the offense, the extent of participation by family members, and the effects that denial or termination would have on family members not involved in the proscribed activity. HACK, in appropriate cases, may permit the remaining members of the family to continue receiving assistance and may impose a condition that family members determined to have engaged in the proscribed activities will not reside in the housing. HACK may require a family member that has engaged in the illegal use of drugs to submit evidence of successful completion of a treatment program as a condition to being allowed to reside in the housing.

## 11D. RETENTION OF FILES

HACK will retain, for a period of three (3) years, a copy of the applicant or Participant file, the notification letters, the family's response, if any, the record of the Informal Review or Informal Hearing (including documentary evidence presented and any audio or visual recording of the proceeding), and a statement of final disposition.

## 11E.   SECTION 504 (Disability Non-discrimination) Grievance Procedure)

HACK has adopted an internal grievance procedure providing for prompt and equitable resolution of complaints alleging any action prohibited by HUD regulations implementing Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794). Section 504 states, in part, that "no otherwise qualified individual with a disability. ...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".

Complaints should be directed to the 504 Compliance Coordinator.

A complaint should be filed in writing and it should contain the name and address of the person filing it, and briefly describe the alleged violation of the regulations.

A complaint should be filed within thirty (30) days after the complainant becomes aware of the alleged discrimination violation. (Processing allegations of discrimination that occurred before this grievance procedure was in place will be considered on a case-by-case basis.)

An investigation, as may be appropriate, will follow the filing of a complaint.  The investigation will be conducted by the 504 Compliance Coordinator. These rules contemplate informal but thorough investigations, affording all interested people and their representatives, if any, an opportunity to submit evidence relevant to a complaint.

Under the HUD regulations, HACK need not process complaints from applicants for employment or from applicants for admission to post-secondary educational institutions.

A written determination as to the validity of the complaint and a description of the resolution, if any, will be issued by 504 Compliance Coordinator and a copy forwarded to the complainant no later than

> ninety (90) days after its filing.

> The 504 Compliance Coordinator will maintain HACK's records and files relating to the complaints filed.

The complainant may request a reconsideration of the case in instances where he/she is dissatisfied with the resolution. The request for reconsideration should be made within thirty (30) days to the Executive Director.

The right of a person to a prompt and equitable resolution of the complaint filed hereunder will not be impaired by the person's pursuit of other remedies such as the filing of a Section 504 complaint with the appropriate federal department or agency. Using this grievance procedure is not a prerequisite to the pursuit of other remedies.

These rules will be construed to protect the substantive rights of interested people, meet appropriate due process standards and assure that HACK complies with Section 504 and its implementing regulations.

All documents related to the informal hearing process, including but not limited to notices, hearing request forms, and written decisions, shall be considered vital documents and will be translated into the family's primary language, if other than English, in accordance with HACK's Limited English Proficiency Plan ("LEP").

# Chapter 12 – Administrative Plan

**Chapter 12**

**HOUSING AUTHORITY, OWNER, AND PARTICIPANT
RESPONSIBILITIES AND OBLIGATIONS**

*Cross Reference: (Reserved)

This Section outlines the responsibilities and obligations of HACK, the Section 8
Owners/Landlords, and the participating families.

## 12A.   RESPONSIBILITIES OF HACK

HACK will comply with the consolidated ACC, the application, HUD regulations and other
requirements, and the Housing Authority of the County of Kern Section 8 Administrative Plan.

In administering the program, HACK will:

1.   Publish and disseminate information about the availability and nature of housing
     assistance under the program;

2.   Explain the program to owners and families;

3.   Seek expanded opportunities for assisted families to locate housing outside areas of
     poverty or racial concentration;

4.   Encourage owners to make units available for leasing in the program, including owners
     of suitable units located outside areas of poverty or racial concentration;

5.   Affirmatively further fair housing goals and comply with equal opportunity
     requirements;

6.   Make efforts to help disabled persons find satisfactory housing;

7.   Receive applications from families, determine eligibility, maintain the waiting list,
     select applicants, issue a voucher to each selected family, and provide housing
     information to families selected;

8.   Determine who can live in the assisted unit at admission and during the family's
     participation in the program;

9.   Obtain and verify evidence of citizenship and eligible immigration status in accordance
     with 24 CFR part 5;

10.   Review the family's request for approval of the tenancy and the owner/landlord lease, including the HUD prescribed tenancy addendum;

11.   Inspect the unit before the assistance occupancy begins and at least annually during the assisted tenancy;

12.   Determine the amount of the housing assistance payment for a family;

13.   Determine the maximum rent to the owner and whether the rent is reasonable;

14.   Make timely housing assistance payments to an owner in accordance with the HAP contract;

15.   Examine family income, size and composition at admission and during the family's participation in the program. The examination includes verification of income and other family information;

16.   Establish and adjust utility allowances. Utility allowances shall be reviewed annually and adjusted when necessary.

17.   Administer and enforce the housing assistance payments contract with an owner, including taking appropriate action as determined by HACK, if the owner defaults (e.g., HQS violation);

18.   Determine whether to terminate assistance to a participant family for violation of family obligations, including HQS violations for which a family is responsible, subject to the due process provisions of this Plan detailed in Chapters 10 and 11;

19.   Give written notice to a participant family of decisions concerning applications, terminations, tenant rent, and all other matters concerning the tenant's participation in the program. Notice of actions shall contain clear statements of:

   a)   The action being proposed by HACK.

   b)   The reason for the proposed action, including the specific facts supporting HACK's decision.

   c)   The date the proposed action will take place.

   d)   The participant's right to further explanation, if needed.

   e)   The participant's right to an informal hearing and the form and date by which request for such hearing must be received. (Refer to Chapter 11 for additional notice and hearing requirements.)

f)      A copy of the Section 8 Program Informal Hearing Procedures.

20.     Conduct informal reviews of HACK decisions concerning applicants for participation in the program, pursuant to the provisions of Chapter 11;

21.     Conduct informal hearings on certain HACK decisions concerning participant families, pursuant to the provisions of Chapter 11;

22.     Provide sound financial management of the program, including engaging an independent public accountant to conduct audits annually; and

23.     Administer Family Self Sufficiency program based upon the minimum size required by HUD as indicated by the number of allocations awarded since 1992.

## 12B.   RESPONSIBILITIES OF THE OWNER.

The owner shall be responsible for performing all of his/her obligations under the HAP contract and lease.    Such responsibilities shall include, but not be limited to:

1.      Performance of all management and rental functions for the assisted unit, including selecting a voucher holder to lease the unit, and deciding if the family is suitable for tenancy of the unit.

2.      Maintaining the unit in accordance with HQS, including performance of ordinary and extraordinary maintenance;

3.      Preparation and furnishing to HACK  information required under the contract;

4.      Compliance with equal housing opportunity requirements;

5.      Collecting from the family:

        a.  Any security deposit,

        b.  The tenant contribution (the part of rent to owner not covered by the HAP);

        c.  Any charges for damage to the housing done by the family;

6.      Enforcing tenant obligations under the lease;

7.      Paying for utilities and services (unless paid by the family tinder the lease). Complying with provisions on modifications to housing occupied or to be occupied by a disabled person.

8.      Screening of tenants

9.      Provide HACK with any and all necessary documents warranting legal ownership of the property. A copy of the recorded grant deed, management agreement, if applicable, the lease agreement. Social Security and or State I.D. Number must be received by HACK and any other documents required by HACK for proof of ownership. Any owner may contract with any private or public entity to perform, for a fee, the services required above, provided that such contract shall not shift any of the owners responsibilities or obligations. HACK must receive a copy of prior to making HAP contract.

10.     For provisions on modifications to a dwelling unit occupied by a person with disabilities, see 24 CFR 100.203.

## 12C. RESPONSIBILITIES OF THE PARTICIPANT FAMILY

This section states the obligations of a participant family under the program.

1.      The family shall:

   a.      Report to HACK, within  ten (10) business days of the occurrence, any change in family income, assets, or family composition

   b.      Supply any information that the HACK or HUD determines is necessary in the administration of the program, including submission of required evidence of citizenship or eligible immigration status. "Information" includes any requested certification, release or other documentation.

   c.      Supply any information requested by HACK or HUD for use in a regularly scheduled reexamination or interim reexamination of family income and composition per HUD requirements.

   d.      Supply information that is true and complete.

   e.      Disclose and verify Social Security numbers and must sign and submit consent forms for obtaining information.

   f.      Allow HACK to inspect the housing unit at reasonable times and after at least two
(2) days' written notice.

   g.      Notify HACK and the owner before the family moves out of the unit or terminates the lease by supplying HACK and the owner with a thirty- (30) day written notice before vacating the housing.

h.     The family must promptly give HACK a copy of any owner eviction notice it receives.

i.     Use the housing solely for the family's principal place of residence, and shall not assign the lease or transfer the housing.

j.     Agree to enter a repayment agreement to reimburse HACK for any amounts paid to an owner for tenant-caused damages upon notification of a claim having been paid by HACK. If the family disputes an owners' claim, HACK must be notified before making payment on an owner's claim. HACK will notify the tenant on receipt of a claim if the former tenant provides HACK with a forwarding address.

k.     Comply with all rules and regulations of the Section 8 Program and HACK policies and terms of the lease with the owner. An incident or incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking will not be construed as a serious or repeated lease violation by the victim or threatened victim of the domestic violence, dating violence, sexual assault, or stalking, or as good cause to terminate the tenancy, occupancy rights, or assistance of the victim.

l.     Respect the rights of others to peacefully enjoy their housing.

m.     Comply with the following use/occupancy rules:

1.     HACK must approve the composition of the assisted family residing in the unit. The family must promptly inform HACK of the birth, adoption or court-awarded custody of a child. The family must request approval from HACK to add any other family member as an occupant of the unit. No other person (i.e., no one but members of the assisted family) may reside in the unit (except for a foster child/foster adult or live in aide as provided in paragraph (4) of this section).

2.     The family must promptly notify HACK if any family member no longer resides in the unit.

3.     If HACK has given approval, a foster child/adult or live-in aide may reside in the unit.  HACK has the discretion to adopt reasonable policies concerning residence by a foster child/foster adult or live-in aide and defining when HACK consent may be given or denied.

4.     Members of the household may engage in legal profit making activities in the unit, but only if such activities are incidental to primary use of the

unit for residence by members of the family. Any business uses of the unit must comply with zoning requirements and the affected household member must obtain all appropriate licenses.

n.  The family must supply any information or certification requested by HACK to verify that the family is living in the unit, or relating to family absence from the unit, including any HACK requested information or certification on the purposes of family absences. The family must cooperate with HACK for this purpose. The family must promptly notify HACK of its absence from the unit.

Absence means that no member of the family is residing in the unit. The family may be absent from the unit for up to thirty (30) days. The family must request permission from HACK for absences exceeding thirty (30) days.  HACK will make a determination within five (5) business days of the request. An authorized absence may not exceed 180 days. Any family absent for more than thirty (30) days without authorization will be terminated from the program, subject to the notice and hearing provisions of Chapter 11 of this Plan.

Authorized absences may include, but are not limited to:

1.  Prolonged hospitalization

2.  Absences beyond the control of the family (i.e., death in the family, other family member illness)

3.  Other absences that are deemed necessary by HACK.

1.  The family shall not:

a.  Own or have any interest in the housing unit (other than they own a manufactured home and rent the manufactured home space. If the owner is a cooperative, the family may be a member of the cooperative.

b.  Commit any fraud, bribery, or any other corrupt or criminal act in connection with the programs.

c.  An assisted family, or members of the family, may not receive Section 8 tenant-based assistance while receiving another housing subsidy, for the same unit or for a different unit, under any duplicative (as determined by HUD or in accordance with HUD requirements) Federal, State or local housing assistance program.

d.  Engage in drug-related criminal activity or other violent criminal activity. Drug-related criminal activity means one of the following:

1)   The felonious manufacture, sale, or distribution, or the  possession, with intent to manufacture, sell, or distribute, of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

2)   The felonious use, or possession (other than with intent to manufacture, sell or distribute), of a controlled substance, except that such use or possession must have occurred within one (1) year before the date that HACK provides notice to an applicant or participant family of HACK's determination to deny admission or terminate assistance.

Criminal activity directly related to domestic violence, dating violence, sexual assault, or stalking, engaged in by a member of a participant's household or any guest or other person under the participant's control, shall not be cause for termination of tenancy, occupancy rights, or assistance of the victim, if the participant or affiliated individual of the participant is the victim.

e.   Allow guests to remain longer than fourteen (14) days within a twelve (12) month period, without prior consent from HACK and the Landlord.

Failure of the Family to meet its responsibilities under the Lease, the Statement of Family Responsibility, or this section shall constitute grounds for termination of assistance by HACK.

# Appendix 8 – Administrative Plan

## Prohibition Against Denial of Assistance to Victims of Domestic Violence, Dating Violence, Sexual Assault, and Stalking [24 CFR Part 5, Subpart L]

The Violence Against Women Reauthorization Act of 2013 (VAWA) protects tenants and participants, and "affiliated individuals" of tenants and participants who are victims of domestic violence, dating violence, **sexual assault,** or stalking from being evicted or terminated from HUD's federally subsidized public housing, Housing Choice Voucher **program, and other federally subsidized housing** programs administered by the Housing Authority of the County of Kern (HACK) based on **actual or threatened** acts of such violence against them.

Additionally, VAWA prohibits denial of admission to an otherwise qualified applicant on the basis **that** the applicant is or has been a victim of **domestic** violence, dating violence, **sexual assault,** or stalking **[24 CFR 5.2005]**. Notwithstanding its title, this provision is gender-neutral and its protection is available to **all** victims of domestic violence, dating violence, sexual assault, or stalking **regardless of gender or sex.**

1. Definitions [24 CFR 5.2003]

   As used in VAWA:

   - *The Term Domestic Violence:* Includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.
   - *The Term Dating Violence:* Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship shall be determined based on a consideration of the following factors:
     - The length of the relationship
     - The type of relationship
     - The frequency of interaction between the persons involved in the relationship
   - *The Term Stalking:*
     - To follow, pursue, or repeatedly commit acts with the intent to kill, injure, harass, or intimidate; or

Housing Authority of the County of Kern
Housing Choice Voucher
Administrative Plan

Appendix 8
Page 1
Board Approved: 07/11/12

- o   To place under surveillance with the intent to kill, injure, harass, or intimidate another person; and
- o   In the course of, or as a result of, such following, pursuit, surveillance, or repeatedly committed acts, to place a person in reasonable fear of the death of, or serious bodily injury to, or to cause substantial emotional harm to (1) that person**(s)**, (2) **an affiliated individual** of that person, or (3) the  spouse or intimate partner of that person.
- *The Term Sexual Assault* means any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent.
- *The Term Affiliated Individual:*
   - o   With respect to a person,
      - A spouse, parent, brother or sister, or child of that person, or an individual to whom that person stands in the position or place of a parent; or
      - **any individual, tenant, or lawful occupant living in the household of that individual.**
- *The Term Bifurcate:* With respect to a public housing or Section 8 lease, to divide a lease as a matter of law such that certain tenants can be evicted or removed while the remaining **'tenants'** lease and occupancy rights are allowed to remain  intact.
- *The Term Perpetrator:* The person who commits an act of domestic violence, dating violence, **sexual assault,** or stalking against a victim.

2. Notification
HACK shall provide the notice developed by HUD pursuant to 42 U.S.C. 14043e-11(d)(1) to an applicant for or tenant of housing assisted under a covered housing program:

- at the time the applicant is denied residency in a dwelling unit assisted under the covered housing program;
- at the time the individual is admitted to a dwelling unit assisted under the covered housing program;
- with any notification of eviction or notification of termination of assistance; and
- in multiple languages, consistent with HACK's Limited English Proficiency Plan (LEP)

Together with such notice, HACK shall provide a certification form approved by HACK that may be used by an applicant or tenant to self-identify as a victim of domestic violence, dating violence, sexual assault, or stalking.  (42 U.S.C. 140432e-11(c)(3)(a).)

This policy shall be incorporated in and made part of the Administrative Plan for the HACK's Housing Choice Voucher Program and referenced in and attached to the five-year and annual public housing agency plan concerning the HACK's activities, services, or programs relating to domestic violence, dating violence, **sexual assault,** and stalking.

3. Admissions and Screening

   A. **Non-Denial of Assistance.** HACK will not deny admission to the Section 8 rental assistance program to any person because that person is or has been a victim of domestic violence, dating violence, **sexual assault,** or stalking, provided that such person is otherwise qualified for such admission.

      1. *Mitigation of Disqualifying Information.* When requested by an applicant for assistance whose history includes incidents in which the applicant was a victim of domestic violence, **dating violence, sexual assault, or stalking,** HACK may take such information into account in mitigation of potentially disqualifying information, such as poor credit history or previous damage to a dwelling. If requested by an applicant to take such mitigating information into account, HACK, shall be entitled to conduct such inquiries as are reasonably necessary to verify the claimed history of domestic violence and its probable relevance to the potentially disqualifying information.

   B. Tenancy or assistance will not be denied by HACK as a result of past criminal activity, if that criminal activity is directly related to domestic violence, dating violence, sexual assault, or stalking, and the applicant is the victim or threatened victim of such criminal activity.

4. Termination of Tenancy or Assistance

   A. *VAWA Protections.* Under VAWA, persons assisted under the Section 8 rental assistance program have the following specific protections, which will be observed by the Housing Authority of the County of Kern:

      1. An incident or incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking will not be considered to be a "serious or repeated" violation of the lease by the victim or threatened victim of that violence and will not be good cause for terminating the tenancy or occupancy rights of or assistance to the victim of that violence.

      2. In addition to the foregoing, tenancy or assistance will not be terminated by the Housing Authority of the County of Kern as a result of criminal activity, if that criminal activity is directly related to domestic violence,

dating violence, sexual assault, or stalking engaged in by a member of the assisted household, a guest or another person under the tenant's control, and the tenant or an affiliated individual is the victim or threatened victim of this criminal activity. However, the protection against termination of tenancy or assistance described in this paragraph is subject to the following limitations:

a. Nothing contained in this paragraph shall limit any otherwise available authority of the Housing Authority of the County of Kern or a Section 8 owner or manager to terminate tenancy, evict, or to terminate assistance, as the case may be, for any violation of a lease or program requirement not premised on the act or acts of domestic violence, dating violence, sexual assault, or stalking in question against the tenant or a member of the tenant's household. However, in taking any such action, neither the Housing Authority of the County of Kern nor a Section 8 manager or owner may apply a more demanding standard to the victim of domestic violence, dating violence, sexual assault, or stalking than that applied to other tenants.

b. Nothing contained in this paragraph shall be construed to limit the authority of the Housing Authority of the County of Kern or a Section 8 owner or manager to evict or terminate from assistance any tenant or lawful applicant if the owner, manager or Housing Authority of the County of Kern, as the case may be, can demonstrate an actual and imminent threat to other tenants or to those employed at or providing service to the property, if the tenant is not evicted or terminated from assistance.

c. An actual and imminent threat consists of a physical danger that is real, would occur within an immediate time frame, and could result in death or serious bodily harm. In determining whether an individual would pose an actual an imminent threat, the factors to be considered include: The duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the length of time before the potential harm would occur.

B. *Removal of Perpetrator.* Notwithstanding anything in the paragraph above or Federal State or local law to the contrary, the HACK or a Section 8 owner or manager, may bifurcate a lease, or remove a household member from a lease, without regard to whether a household member is a signatory to a lease, in order to

Housing Authority of the County of Kern
Housing Choice Voucher
Administrative Plan

Appendix 8
Page 4
Board Approved: 07/11/12

evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in acts of physical violence against family members or others. Such action against the perpetrator of such physical violence may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of such violence who is also the tenant or a lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by law applicable to terminations of tenancy and evictions by the Housing Authority of the County of Kern.

C.  If HACK evicts, removes, or terminates assistance to a perpetrator of domestic violence, dating violence, sexual assault, or stalking, and the individual is the sole tenant eligible to receive assistance under a covered housing program, the public housing agency or owner or manager of housing assisted under the covered housing program shall provide any remaining tenant an opportunity to establish eligibility for the covered housing program. If a tenant described in the preceding sentence cannot establish eligibility, the public housing agency or owner or manager of the housing shall provide the tenant a reasonable time, as determined by the appropriate agency, to find new housing or to establish eligibility for housing under another covered housing program.

5.  Verification of Domestic Violence, Dating Violence, Sexual Assault, or Stalking

A.  *Requirement for Verification.* The Housing Authority may require verification in any case where an individual claims VAWA protection. Section 8 owners or managers receiving rental assistance administered by the HACK may elect to require verification, or not to require it, as permitted under applicable law.

Verification of a claimed incident or incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking may be accomplished by any of the following:

1.  *HUD-Approved form* – by providing to HACK or to the requesting Section 8 owner or manager a written certification, on a form approved by the U.S. Department of Housing and Urban Development (HUD):

    • That the individual is a victim of domestic violence, dating violence, sexual assault, or stalking

    • That the incident or incidents in question are incidents of actual or threatened violence, assault, or stalking meeting the requirements of the applicable definitions set forth in this policy.

- Includes the name of the perpetrator, if the name is known to the tenant or applicant and safe to provide.

2. *Other Documentation-* In lieu of the certification form or in addition to the certification form, HACK may accept documentation signed by both:
   - An employee, agent, or volunteer of a victim service provider, an attorney, a medical professional, or a mental health professional from whom the applicant or tenant has sought assistance relating to the domestic violence, dating violence, sexual assault, or stalking, or the effects of such violence, assault, or stalking; and
   - The applicant or tenant.

   The documentation shall state, under penalty of perjury, the professional's belief that the incident or incidents in question meet the requirements of the applicable definition(s) set forth in this policy.

3. *Police or Court Record-* by providing to HACK or to the requesting Section 8 owner or manager a Federal, State, tribal, territorial, or local police or court record relating to the incident or incidents in question.

4. a statement or other evidence provided by an applicant or tenant..

B. *Time allowed to provide verification/ failure to provide.* An individual who claims protection against adverse action based on an incident or incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking, and who is requested by HACK, or a Section 8 owner or manager to provide verification, must provide such verification within 20 business days (i.e., 20 calendar days, excluding Saturdays, Sundays, and federally-recognized holidays).

6. **Emergency Transfers**

HACK shall allow tenants who are victims of domestic violence, dating violence, sexual assault, or stalking to transfer to another available and safe dwelling unit assisted under a covered housing program if the tenant expressly requests the transfer; and

- The tenant reasonably believes that the tenant is threatened with imminent harm from further violence if the tenant remains within the same dwelling unit assisted under a covered housing program; or
- In the case of a tenant who is a victim of sexual assault, the sexual assault occurred on the premises during the 90-day period preceding the request for transfer.

A victim requesting an emergency transfer under subsection may receive a tenant protection voucher, subject to the availability of such vouchers.

Housing Authority of the County of Kern
Housing Choice Voucher
Administrative Plan

Appendix 8
Page 6
Board Approved: 07/11/12

HACK shall also direct owners and managers of assisted housing to allow tenants who are victims of domestic violence, dating violence, sexual assault, or stalking to transfer to another available and safe dwelling unit as provided above.

In connection with emergency transfers described in this section, HACK shall take reasonable confidentiality measures to ensure that HACK or the Section 8 owner or manager does not disclose the location of the dwelling unit of a tenant to a person that commits an act of domestic violence, dating violence, sexual assault, or stalking against the tenant.

7. **PHA Confidentiality Requirements [24 CFR 5.2007(a)(1)(v)]**

All information provided to the PHA regarding domestic violence, dating violence, sexual assault, or stalking, including the fact that an individual is a victim of such violence, assault, or stalking, must be retained in confidence and may neither be entered into any shared database nor provided to any related entity, except to the extent that the disclosure (a) is requested or consented to by the individual in writing, (b) is required for use in an eviction proceeding, or (c) is otherwise required by applicable law. If disclosure is required for use in an eviction proceeding or is otherwise required by applicable law, the PHA will inform the victim before disclosure occurs so that safety risks can be identified and addressed.

Housing Authority of the County of Kern
Housing Choice Voucher
Administrative Plan

Appendix 8
Page 7
Board Approved: 07/11/12

# Joint Press Release

Five low income tenants have reached an agreement with the Housing Authority of the County of Kern in a federal lawsuit. The tenants will be reinstated to the Section 8 Program so long as they are still eligible.  The Housing Authority will make changes to their Section 8 Administrative Plan primarily related to the hearing process.

The five plaintiffs filed a lawsuit, *Murphy et al. v. Housing Authority of the County of Kern*, after the Housing Authority terminated their Section 8 assistance. The federal Section 8 Housing Choice Voucher Program provides critical rental assistance to people with extremely low incomes, like the plaintiffs, so that they can secure decent and safe affordable housing. Program participants receive a voucher for a subsidy that supplements what the individual or family can pay for rent in the private market.

The settlement agreement provides that:
- The Housing Authority will restore the Section 8 housing vouchers to all the Plaintiffs provided that they are still eligible for the program.
- The Housing Authority will hire professional hearing officers, who are not affiliated with the Housing Authority and who are knowledgeable in the areas of federally subsidized housing, landlord/tenant law, fair housing and basic constitutional principles to act as hearing officers for termination hearings.
- The Housing Authority will revise its Administrative Plan and provide comprehensive training to all Section 8 staff.

The tenants are represented by Greater Bakersfield Legal Assistance, Western Center on Law and Poverty, and Sidley Austin LLP.

**For More Information**

| | |
|---|---|
| Celida B. Miramontes | Madeline Howard |
| Greater Bakersfield Legal Assistance, Inc | Western Center on Law & Poverty |
| (661) 334-4674 | (213) 235-2628 |
| cmiramontes@gbla.org | mhoward@wclp.org |